[Civil No. 3321.   Filed April 26, 1934.]

[31 Pac. (2d) 971.]

GRAND INTERNATIONAL BROTHERHOOD OF LOCOMOTIVE ENGINEERS, BROTHERHOOD OF LOCOMOTIVE FIREMEN & ENGINEMEN et al., Appellants, v. ARTHUR L. MILLS, HERBERT BURGESS and FRANK R. BENTON, Appellees.

GRAND INTERNATIONAL BROTHERHOOD OF LOCOMOTIVE ENGINEERS, BROTHERHOOD OF LOCOMOTIVE FIREMEN & ENGINEMEN et al., Appellants, v. J. E. ANDERSON and JAMES F. MARTIN, Appellees.

Mr. Thomas Stevenson, Mr. C. E. Weisell and Messrs. Conner & Jones, for Appellants Other Than Southern Pacific Company.

Mr. Francis M. Hartman, for Southern Pacific Company.

Mr. Carl R. Tisor, Mr. George O. Hilzinger, Mr. Leslie C. Hardy and Mr. Samuel L. Pattee, for Appellees.

LOCKWOOD, J.—This is an appeal from a judgment of the superior court of Pima county requiring the Southern Pacific Company, a corporation, hereinafter called the Company, to grant certain seniority rights of service to the plaintiffs, who are railroad engineers and firemen in its employ, and enjoining the other defendants from interfering with the rights so ordered to be granted by the Company. We think the best manner of disposing of the appeal is to state first the undisputed facts as a result of which suit was brought, and afterwards to discuss the legal questions raised thereby, in such manner as seems advisable.

The Company is, and for many years has been, a corporation engaged in the operation of one of the main transcontinental railroads, and employs many men in its train service. A large number of these men belong to two voluntary unincorporated associations, the first being the Brotherhood of Locomotive Engineers, which we shall hereinafter call the Engineers, which is composed of qualified locomotive engineers in the United States and Canada, and comprises within its membership a large majority of the persons employed as locomotive engineers in

those countries. Its membership is organized into local bodies called divisions, each division having its own local officers. Its supreme governing body is known as the Grand International Division, whose chief executive is the Grand Chief Engineer, there being a number of other executive officers known as Assistant Grand Chief Engineers. This brotherhood, in its various activities, is governed by a constitution, statutes, and standing rules.

The other association is called the Brotherhood of Locomotive Firemen and Enginemen, which we shall hereinafter call the Firemen, and is composed of both firemen and engineers in the United States and Canada, and comprises within its membership a large majority of the men employed as firemen on the railroads of the two countries. Its membership is divided into local bodies which are known as lodges, and its supreme governing body is known as the convention, which triennially chooses an international president and a number of vice-presidents. It also is governed by a constitution, statutes and various rules.

Each local division of the Engineers and lodge of the Firemen has a committee for the purpose of handling local matters of controversy with the local officers of the railroad company for which its members work. In the Engineers this committee is known as the local committee of adjustment, and in the Firemen as the local grievance committee. On each railroad system there is organized a general committee of each brotherhood, which in the case of the Engineers is known as the general committee of adjustment, and in the case of the Firemen as the general grievance committee. These two general committees are composed of the chairmen of the local committees above referred to. In the case of a large railroad system, there are usually many local

divisions and lodges, and the general committees would therefore have as many members as there are divisions or lodges along the line of the railroad. The powers and duties of these general committees are defined in the respective laws of the brotherhoods. Generally speaking, it is one of the functions of the general committee of adjustment of the Engineers to negotiate agreements between the members of its brotherhood working for the particular railroad on which the local divisions represented in such general committee of adjustment exist, and the general grievance committee of Firemen does the same for the members of its brotherhood. Each of these general committees selects from among its membership a general chairman, whose powers are fixed by the constitution and laws of the brotherhoods, and generally are coextensive with the powers of the general committees themselves, when the latter are not in session.

For many years written agreements have been in existence between the Company and the two brotherhoods governing the rates of pay and working conditions of members of the brotherhoods on the lines of the Company; the last ones prior to the beginning of this controversy being entered into as of December 29, 1922. Among other things, these agreements provided for what is known as ''seniority rights'' of the members of the respective brotherhoods. Seniority, as applied to trainmen, means, in substance, that a man employed as either an engineer or fireman shall be entitled to preference in the matter of choice of and right to work in his occupation, in accordance with the length of time he has been employed as such engineer or fireman by the company for which he works. This right of seniority, however, does not necessarily apply over the whole railroad system on a part of which he is working, as the

system, if long, is divided into a number of seniority divisions, and the seniority of an engineer or fireman is confined exclusively to his own district, and does not give him any rights whatever in another seniority district.

On the 29th of December, 1922, the lines of the Company were divided into eleven seniority districts, among these being what is known as the Tucson district, which covered the tracks of the Company between Yuma and El Paso. Prior to the 1st day of December, 1924, another railroad corporation, the Arizona Eastern by name, owned and operated a line running from what is called Pozo Junction, through Phoenix to Hassayampa, one from Phoenix to Maricopa, and one from Bowie to Miami. It also had operating agreements with the two brotherhoods, and by these agreements was divided into two seniority districts, one called the Globe district, which covered its lines from Bowie to Miami, and the other called the Phoenix district, comprising the balance of its road.

Some time in the latter part of the year 1923, J. A. Ford, who was then general chairman of the grievance committee of Firemen on the Southern Pacific System, was informed by R. McIntyre, assistant general manager of the Company, that plans were being made to consolidate the Arizona Eastern with the Company, and that it wished advice and instructions as to what should be done in regard to the respective seniorities of the men on the two roads. On December 20th of that year, Ford wrote to D. B. Robertson, who was then president of the Firemen, asking for his advice and instructions as to what should be done. Robertson replied, expressing his views fully. Nearly a year later, and on October 18, 1924, G. W. Burbank, who was general chairman of the adjustment committee of the Engineers, wrote to

Grand Chief Engineer L. G. Griffing, informing him in regard to the proposed merger, and asking for instructions as to what the Engineers should do. To this the latter replied in effect that the seniority districts could not be merged without a vote of the men. On November 23, 1924, McIntyre notified all of the chairmen of both organizations involved that the merger was about to take effect and that seniority rights would have to be adjusted, and requested a conference for that purpose. Before any action was taken in regard to this question, a new agreement was made, effective as of September 1, 1924, but not actually concluded until December 16th of that year, which contained the following provision: "Without change in present working rules, except as indicated herein, the management and committees will arrange to revise current schedules to conform to this agreement," which was signed by the general chairmen of the committees of both brotherhoods on the lines of both the Company and the Arizona Eastern, and was duly approved by the national officers of the brotherhoods.

On January 23, 1925, a conference was held between the general chairmen of the committees and a representative of the Company, apparently in pursuance of McIntyre's request of November 3, 1924, and the following agreement was made between them:

"Memorandum of Agreement

"At conference held January 23, 1925, the following understanding was reached with respect to adjustments of seniority and rearrangement of seniority lists between former Tucson Division, Southern Pacific Company, and former Globe and Phoenix Divisions of the Arizona Eastern Railroad, affecting engineers, firemen, and hostlers.

"(1) Seniority lists of the above named divisions will be merged, each engineer, fireman and hostler

taking rank on the merged lists in accordance with date shown on the separate respective seniority lists as of December 1, 1924.

"(2) Where two or more named on the merged lists bear the same date, their relative standing shall be in accordance with the time they performed first service on their original district referred to above.

"(3) Enginemen on each seniority district merged will have priority rights to assignments held as of December 1, 1924, unless displaced by senior men on same former seniority district, or until such time as agreement rules require same to be rebulletined."

On February 11, 1925, the local Firemen's lodge of Tucson passed the following resolution:

"Motion made and seconded that the secretary of this lodge notify the Grand Lodge of the Brotherhood of Locomotive Engineers and the Grand Lodge of the Brotherhood of Locomotive Firemen and Enginemen, with copies to Brothers G. W. Burbank, J. A. Ford, R. F. White, I. P. McBride, W. H. Skinner, C. W. Littlefield, and local lodges, that Cactus Lodge #94 contests and protests agreement and rearrangement of seniority lists between former Tucson Division, Southern Pacific Company, and former Globe and Phoenix Division of Arizona Eastern Railroad, on the grounds

"First: That it is unjust, as

"1. Trackage was not considered;

"2. Tonnage was not considered.

"Second:

"1. Men were not consulted.

"Third:

"1. A meeting should have been held between the men prior to the meeting with the General Grievance Committees if the General Grievance Committee had authority to act;

"2. Plans were not submitted to the men;

"3. Unfair—as the Southern Pacific men have already undergone reduction on account of big power, and the Arizona Eastern men have not. We feel that we should not be required to bear this again,"

—which resolution was duly forwarded to the grand officers of both brotherhoods under the seal of the lodge.

On February 14, 1925, in accordance with the agreements reached December 16, 1924, and January 23, 1925, formal and complete contracts between the Firemen and the Engineers were executed by the Company and the general chairmen of the brotherhoods, which, among other things, in defining the various seniority districts, changed the definition of the Tucson district, as found in the agreements of December 29, 1922, to read: "Between Yuma and El Paso, including former Arizona Eastern R. R.," and, in pursuance of the merger of the seniority districts as thus set forth in the contract, on March 10, 1925, the seniority lists of the merged districts were readjusted and details set forth as to how the readjustment should be carried out. This was also signed by the same officers.

Various protests against these mergers were made by the members of the Tucson locals of both brotherhoods to the international organizations, and as a result thereof the grand executives delegated Assistant Grand Chief Smith of the Engineers and Vice-President Boone of the Firemen to conduct an investigation of the situation and report thereon. These officers came to Tucson and conducted open hearings for nearly two weeks, at which all interested parties were given full opportunity to express their views. At that time the representatives of the men on the former Arizona Eastern upheld the merger of the seniority districts, while the representatives of the Tucson men took the position that the merger should be set aside.

After considerable discussion, General Chairmen Burbank and Ford, together with Grand Officers Smith and Boone, went to Cleveland, Ohio, for con-

ferences with the chief executives of the two brother-
hoods, and laid the whole situation before them. As
a result of this conference, the two general com-
mittees of the Firemen and Engineers were in-
structed to convene and endeavor to work out a
satisfactory solution of the problem, Grand Chief
Engineer Johnston of the Engineers ruling that any
solution arrived at must be submitted to a vote of
the engineers in the districts involved. The com-
mittee remained in session for a week, and finally
recommended that the provisions of the agreement
of March 10, 1925, which merged the Phoenix, Globe,
and Tucson seniority lists, be submitted to the mem-
bership of the Engineers separately in each of the
districts, which was done, and the agreement failed
of adoption; the Tucson division voting almost
unanimously against it.

Thereafter the chief executives directed Smith and
Boone to negotiate jointly with the Company for
restoration of the former seniority districts, and,
after some written discussion between them and
McIntyre, the latter under date of January 29, 1926,
submitted a detailed proposition for a return to the
separate seniority districts in effect prior to the
merger, which was duly accepted by Smith and
Boone as representing their respective brotherhoods.
The men employed actually returned to the several
original seniority districts in accordance with the
agreement of January 29, 1926, and no appeal or
protest was ever made against the last-named agree-
ment with the brotherhoods or any proper official
thereof until October 3, 1930.

In the meantime the Company had been construct-
ing new trackage connecting the former Phoenix
division of the Arizona Eastern with the main line
of the Southern Pacific at Picacho and Wellton, and
the question arose shortly after August 1, 1926, as

to whether the new trackage so constructed was a part of the Phoenix seniority district or the Tucson district.

On or about October 1, 1926, General Chairmen Burbank and Ford ruled that the new track should be divided equally between the two seniority districts. With the completion of this trackage, a number of the trains which had previously been routed over the old Tucson district trackage were routed by way of Phoenix, and it became of great importance to the men on those runs to determine to which district credit should be given for these trains, and how much of the new mileage belonged to each district. The Tucson men contended for what is known as the "diversion of traffic" rule, while the Phoenix men claimed what is called the "lap mileage" rule, so far as these trains were concerned. Efforts were made to settle the whole matter amicably by the representatives of the two districts, and the matter was referred to General Chairmen Burbank and Ford. Their solution of the situation was not satisfactory to all the men, and, after several attempts to settle the matter by mutual agreements, the Tucson men of both brotherhoods requested that Grand Lodge officers be sent to make a permanent settlement of the question. In accordance with this, Assistant Grand Chief Engineer Hedges and Vice-President Leisure held a meeting at Phoenix, and all persons interested were given full opportunity to discuss the question, but no agreement could be effected, and the grand officers on April 8, 1927, filed a report in the nature of a statement of facts and recommendation for settlement with the grand chief executives. Finally, and as of date May 4, 1927, the chief executives rendered their decision, which in effect denied the contention of the Tucson men, and held that the new trackage should be divided equally between the

two districts, each district retaining its own old track, and the various runs were adjusted according to the lap mileage rule. No specific statement was made therein as to whether there were one or two seniority districts, it being apparently assumed there were two. This decision was communicated to the Company and the general local chairmen of the brotherhoods, and was placed in effect June 25, 1927.

Many of the men in the Tucson seniority district were dissatisfied with the decision and formed an organization for the purpose of contesting its validity in the courts, and on August 4, 1927, Frank McCaffery, an engineer and member of the Tucson division of the Engineers, and Marshall H. Rawson, a member of the Tucson lodge of the Firemen, filed identical suits in the superior court of Pima county. These suits were against the two international brotherhoods and their officers, the various engineers and firemen of the Phoenix seniority district, and the Southern Pacific Company. They were avowedly based on the theory that the plaintiff had certain seniority rights by virtue of the contract between the company and the brotherhoods, which were injuriously affected by the restoration of the old seniority districts as they existed before January 1, 1925, and by the action of the Company under the decision of May 4, 1927, and specifically set up that there were a large number of persons employed by the Company within the Tucson seniority district, who were similarly situated with the plaintiff, and had the same rights by reason of their seniority and the terms of their contract, and that the suit was brought on behalf of plaintiff and all others similarly situated. The answers set up the existence of the Tucson and Phoenix districts as separate seniority districts, and that the brotherhoods had settled all the rights of the plaintiffs and all others similarly

situated by the decision of May 4, 1927. The cases were heard before the court on their merits, and, after due consideration, judgment went against the plaintiffs. The plaintiffs in the present actions at all times knew of the existence of the McCaffery and Rawson suits, and had been solicited to contribute to the cost thereof, but refused to do so, or to participate therein in any manner. No appeal was ever taken from the judgment in these two actions. In the meantime many of the Tucson men had requested the chief executives to reopen their decision of May 4, 1927, and in April, 1929, the latter met with representatives of the Tucson and Phoenix men and heard their arguments in regard to reopening their former decision. Following this hearing, and on May 16, 1929, the application to reopen was denied.

In May, 1929, a new contract was entered into between the Firemen and the Company which named the following seniority districts:

"Tucson District. Between Yuma and El Paso via Gila and Lordsburg, including Nogales Branch. . . ."

"Phoenix District. Former Phoenix division of the Arizona Eastern Railroad, Hassayampa to Christmas, including branch lines from Phoenix to Maricopa and Casaba,"

—and on January 9, 1931, by agreement with the engineers, similar districts were defined.

On March 20, 1931, Arthur L. Mills, Herbert Burgess and Frank R. Benton, who were firemen belonging to the Tucson lodge, filed a suit in the superior court of Pima county against the Company, the two brotherhoods, and various officials thereof, and the membership of the Engineers' and Firemen's Lodges on the Phoenix seniority division. The complaint is extremely voluminous, and we therefore do not attempt to set it forth at length. It states, in substance, most of the matters contained

in the foregoing statement of facts, including all of the various attempted agreements referred to therein, and particularly the conclusion of the chief executives of the brotherhoods dated May 4, 1927, in which they made their decision as to how the questions of new mileage and application of seniority thereto in controversy between the various members of the brotherhoods should be settled, and then alleges as follows:

"XLI. Plaintiffs allege that the purported findings of fact set forth in said decision of May 4, 1927, are in truth and in fact, false, untrue and incorrect, and were made falsely and fraudulently, and with the intent to deprive the plaintiffs of their Seniority Rights as heretofore set forth, contrary to the agreements, hereinbefore set forth, and the Constitutions of the defendants, Brotherhood of Locomotive Firemen and Enginemen and Grand International Brotherhood of Locomotive Engineers, and the said Chicago Joint Agreement."

"XLV. Plaintiffs further allege that in the rendition of the said decision of May 4, 1927, and the illegal causing of the same to be placed into force and effect by the defendant, the Southern Pacific Company, as herein alleged, bad faith, fraud and unfairness were practiced and shown by the defendants and two Chief Executives, Johnston and Robertson, in that the subject matter of the controversy set forth in the decision of May 4, 1927 was not in fact acted upon by the two Chief Executives, Johnston and Robertson, jointly with a statement of facts from the two General Chairmen as herein alleged, in accordance with the provisions of the Chicago Joint Agreement and the Constitution, By-Laws and working agreements of them, but that said decision of May 4, 1927 was the result of and the action by the subordinates of the two Chief Executives aforesaid; and that the said decision of May 4, 1927 was wrongful, fraudulent and rendered in bad faith and unfairness in that due consideration was not given to the Seniority Rights of these plaintiffs, personal

and property, and was wholly illegal and without jurisdiction as herein alleged and set forth.''

''XLVI. That the restoration of the Seniority Rights and lists as of January 1, 1925, as herein specifically alleged, was wrongful, arbitrary, fraudulent, illegal and made and done in violation of the then existing working agreements between the Southern Pacific Company and the Brotherhood of Locomotive Firemen and Enginemen, and the Grand International Brotherhood of Locomotive Engineers, and the Grand International Division of the Grand International Brotherhood of Locomotive Engineers, as well as contrary to the Constitution and By-Laws of said defendant Brotherhoods.''

The prayer for relief was for a restoration of their seniority rights in accordance with the merger agreement of January 23, 1925; that the decision of May 4, 1927, be declared null and void; that the Company be restrained from depriving them of such seniority rights as they would have had by virtue of such agreement; and that all the other defendants be restrained from interfering with their seniority rights as fixed thereby.

J. E. Anderson and James L. Martin, being engineers and members of the Tucson division filed a suit which was substantially similar in its nature, except that it was intended to prevent interference with their seniority rights as engineers. In none of these cases did the plaintiffs claim to appear for anyone except themselves.

It is obvious from reading the complaints that these suits are an attempt on the part of the plaintiffs to secure the intervention of a court of equity to preserve seniority rights which they claim belong to them by virtue of certain contracts with the Company, and to prevent the Company and the officials and members of their international brotherhoods from in any manner interfering with such rights.

The Company took the position that it was, in substance, a mere stakeholder and not interested in what was, according to its contention, a dispute between different members of the same brotherhoods, and that the matter should be settled by the brotherhoods and not by the courts, but that, if the latter took jurisdiction, it was indifferent as to what the final judgment should be, and such has been its attitude throughout all the proceedings.

The other defendants demurred specially on various grounds, and generally on the ground that the complaint did not state facts sufficient to constitute a cause of action. They also demurred on the ground that the complaint was barred by the statute of limitations, and interposed a plea in bar setting up the previous suits by Rawson and McCaffery, and claiming that they were *res judicata* as to the plaintiffs in the present proceedings. All the demurrers of the defendants were overruled, and the pleas in bar, after presentation of evidence thereon, were submitted to the court, and finally overruled, and the cases were then consolidated and heard upon their merits before the court, sitting with the aid of a jury. The trial lasted from January 11 to February 5, 1932, upon which last-named date the jury returned its verdict. The case was then taken under advisement by the court, and on May 31st findings of fact were made and judgment formally rendered in favor of the plaintiffs. The judgment, in substance, was to the effect that the agreement of January 23, 1925, was the last valid and legal one made between the brotherhoods and the Company which affected the seniority rights of the plaintiffs, and the Company was required to restore the seniority rights of its employees as they existed by virtue of the said agreement, and the other defendants were enjoined from interfering with such rights, except as the same might at a later date be legally changed.

There are thirty-two assignments of error which we shall consider as far as necessary in accordance with the legal questions raised thereby, and in their logical rather than their numerical order. The first question is whether the interference with plaintiffs' "seniority," as involved in this controversy, justifies a court of equity in granting relief by injunction.

The principles of equity and their application, as part of the law of the American states, are derived from the English law, which in its turn was anticipated by a similar development of the same principles in Roman jurisprudence, and the real purpose, jurisdiction and powers of equity courts as they exist to-day cannot be fully understood, and their rules properly applied, without some consideration of the principles which run through these three great systems. In the early development of Roman law we find the same condition existing which appears in the legal history of practically all primitive peoples. The various actions originally given for the enforcement of civil rights were arbitrary and formal in the highest degree. Absolute accuracy was required in complying with the established rules, and the slightest omission was fatal. As a result, the jurists who enforced those laws soon arrived at a point where they considered as the essentials of any action the form and method pursued, rather than the rights of the parties.

In endeavoring to get away from the extreme formalism which characterized the Roman law at this state of development, its later jurists did three things: They continued the old forms of action, but extended their application to new cases, facts and circumstances, and established a number of new actions which were analogous to the old, but changed the formulas to fit in with later developments of society. But the third and the most important

change consisted in the establishment of new actions which were wholly different, both in principle and form, from any that had existed under the old law. In this manner there was established the Roman law, as we now know it, arranged by the great jurists of the later empire under the familiar name of Corpus Juris. The fundamental principle of this new law was that jurisprudence should be brought into harmony with the general principles of morality and justice, as they were then understood, so that, when an adherence to the strict letter of the law did a moral wrong and produced an inequitable result, a remedy should be provided which should befit the occasion. To this body of moral principles thus introduced into the Roman law was given the name *aequitas,* and it embraces substantially the modern conceptions of right, duty, justice and morality. In its turn the English law passed through the same stages as did the Roman, but, unlike the Roman jurists, who had no previous model from which to draw aid, the English authorities had Roman precedent before them, and the course followed was in many respects the same as that adopted by Rome. There was, however, one important difference. In the Roman system the ordinary magistrates were willing to adopt the general principles of *aequitas,* and accomplished the reform in procedure through their own jurisdiction; thus preserving in their jurisprudence a unity which the English and American systems have lacked for many years, and which they are just beginning to approach by reason of new legislation. In England the existing common-law courts refused to adopt these principles, and it was necessary to set up a new and distinct system of courts to interpret and enforce them.

But the ultimate goal of any legal system is to do justice, and the principle that as circumstances

change it is necessary to change the forms of law in order that such justice might be done was at the foundation of the English equity jurisprudence as well as of the later Roman law. It seems, however, that humanity is engaged in a constant internal struggle between the tendency toward the preservation of existing form and that towards the adoption of necessary reform, and at times the one, and at times the other, element has gained a temporary supremacy. No sooner were the new equity courts introduced into England than they developed the same tendency towards formalism that they were instituted to abolish, and there has been a constant struggle between the ordinary judges and practitioners, whose natural tendency was to adhere closely to precedent, regardless of altered circumstances, and the more enlightened jurists and legislators, who better understood the principles back of equity jurisprudence and the necessity for keeping the methods and forms through which they were applied abreast of changing conditions.

By the time the American colonies separated from the English crown, equity jurisprudence in England had partially lost sight of the necessity which caused its establishment, and had become almost as rigid and formalistic a system as the common law, whose faults it was designed to correct. Equity, as at first administered in the colonial and early state courts, followed the English practice closely, although eventually its powers and functions were given to the common-law courts to administer, except in a few jurisdictions. But this change in the courts which administer it was not always accompanied by a true understanding of its principles, and even yet many American courts have apparently failed to realize that the immutable principles of *aequitas* can and should be applied to our changed and changing eco-

nomic conditions, notwithstanding that, in order to do so, it may be necessary to revise, modify and add to the class of cases where the peculiar equitable remedies should be applied. The jurisdiction of a court of equity does not depend upon whether the court has or has not granted relief under similar circumstances, but upon the necessities of mankind and the correct principles of natural justice which are applicable alike to all conditions of society, all ages, and all people, and the courts should adapt their practice and course of proceeding to the existing state of society, and not, by too strict an adherence to forms, rules and precedents, decline to administer justice. The ingenuity of man in devising new forms of wrong cannot outstrip the development of equity, and under all situations and circumstances its principles should point the way to justice where strictly legal remedies fail. Precedents may guide us, but should never bar action where action is necessary. When a new condition arises and the legal remedies afforded are inadequate, the never-failing capacity of equity to adapt itself to the situation will be found equal to the emergency. It is the glory of American civilization that it is animated by a spirit of progress. It is constantly striving to lead humanity toward a higher goal in things both material and moral, and we believe the courts of the land, instead of acting as a drag on the wheels of social justice, merely because there is no precedent for the action required, should apply the principle that wherever there is a right there is a remedy, and use their power to protect that right effectually, even if in so doing they are forced to broaden their definitions and extend their jurisdiction over a field which was not previously covered, either because it did not exist, or was not properly understood in the past. The fundamental idea underlying equity jurispru-

dence is that a court of equity will take jurisdiction where a right exists which cannot be adequately protected by common-law remedies.

It is urged by defendants that the so-called seniority right involved in this action is not a property right, and that equity will only intervene to protect property and not personal rights, and further that there is an ample remedy at law, if the right exists at all. It is true that it is frequently stated that equity intervenes only for the protection of property rights, but the more modern decisions are rapidly approaching a point where they protect rights which can only upon the most strained construction be considered property rights in the old and limited sense of the term. For years the jurisdiction of equity over infants has been upheld, regardless of any property rights. *Wellesley* v. *Beaufort,* 38 Eng. Reprint 236. Equity has granted relief by injunction against nuisances merely because they interfered with personal safety or comfort and not with property. *McKillopp* v. *Taylor,* 25 N. J. Eq. 139; *Catlin* v. *Valentine,* 9 Paige (N. Y.) 575, 38 Am. Dec. 567; *Soltau* v. *De Held,* 61 Eng. Reprint 291. In New York an injunction was granted against dispossessing a tenant because she was ill and could not be removed without endangering her life. *Weber* v. *Rogers,* 41 Misc. 662, 85 N. Y. Supp. 232.

But, even taking the narrower rule that there must be some interference with a property right, what is property? As was said in *Dixon* v. *Holden,* L. R. Equity, vol. 7, p. 488:

" . . . What is property? One man has property in lands, another in goods, another in a business, another in skill, another in reputation, and whatever may have the effect of destroying property in any one of these things (even in a man's good name) is, in my opinion, destroying property of a most valuable description . . . Professional reputation is the

means of acquiring wealth, and is the same as wealth itself. . . . ''

We agree that destroying the means of acquiring wealth is the same as destroying the wealth itself, and think that any illegal interference with the means whereby a man earns his livelihood is as much subject to the jurisdiction of a court of equity as interference with the tangible and visible property acquired through that earning power.

Let us then consider more carefully the nature of this seniority right, and whether it falls within the definition of property as above set forth. It is only by means of his labor that the average man can earn the wherewithal to support himself and his family, and perchance, if he is fortunate and frugal, make investments which will provide for his old age. Such being the case, it is of vital importance to those who work for salary or wages, and they constitute a large and constantly increasing part of our citizens, that their opportunity to work be as constant, certain, and lucrative as possible.· Anything which tends to promote this increases the earning power of the worker, while anything which tends to diminish it is as great an attack upon his means of livelihood as would be the actual destruction of the physical property through which the wealthier and more fortunate individual obtains his income. A study of the reason for, and the history of, the seniority rule which, although best known among railroad men, is growing more and more in favor among the workers in every class, makes this clear. So long as the contract of employment between a corporation and its hundreds and thousands of employees provides for seniority, it is in effect unemployment insurance which the worker has purchased by his years of faithful service. Essentially it is as much a part of his wages as though he received an increase therein and

used the increase to buy such insurance therewith. Ten years of service gives him a far greater certainty of retaining his employment than is obtained by one year of service, and in times of fluctuating employment particularly this is of great money value. The very fact that, as the record reveals, the matter was fought so bitterly within the ranks of the brotherhoods themselves, shows that it is not a mere imaginary or sentimental interest which plaintiffs are seeking to protect, but something which may mean the difference between poverty and a competence, between public aid and a self-respecting and independent home. We believe that a seniority right is, under the true principles of equity, as much entitled to protection in case it is invaded as any physical property right which is known.

But, it is urged, even though seniority rights are guaranteed by the contract between the Company and the brotherhoods, the contract may be abrogated upon thirty days' notice by either party, and the employer still retains the right to discharge the employee and thus terminate any right which he may have. True, but the Company has not abrogated its contract nor evinced any desire so to do; it has not discharged the plaintiffs, nor, so far as the record shows, does it intend to. The right is a present existing one under the contract, and until it is legally terminated we need not consider what will then be the status of the parties. So long as it exists, it is entitled to protection.

Nor do we think the argument that there is an adequate remedy at law is tenable. It is suggested that, if any of the plaintiffs are deprived of their seniority, they have a remedy by an action for damages for breach of the contract. The question immediately presents itself as to when the right of action arises, and what would be the judgment. Ob-

viously, assuming plaintiff's seniority rights to be taken away from him, it would involve a question of which particular job at any time he was entitled to under those rules, and how long he was deprived of it. If he brings suit to-day, and the deprivation continues, he must bring another to-morrow, and a third the day after. It seems to us it is obvious that a right of this nature cannot be adequately protected by a judgment in money damages. On the other hand, an order commanding the employer to do what it has expressed its perfect willingness to do, that is, to arrange the seniority rights of the different employees in accordance with its contract as interpreted by the court, is a complete protection of whatever rights the various parties may have, and will last until the contract which gives those rights is abrogated, or the particular employee is no longer in the service of the Company.

We have examined carefully the cases cited by defendants which they claim lay down the rule that seniority rights will not be protected by the courts. The case of *Mosshamer* v. *Wabash Ry. Co.*, 221 Mich. 407, 191 N. W. 210, 211, is apparently the only one which attempts to reason the question at any length. Therein the court said:

" . . . If we accede to the plaintiffs' full contention that the agreement between the company and the brotherhoods was made by the brotherhoods as their agents and for their benefit, and that they therefore have a binding agreement with the company, a contention we do not deem it necessary at this time to either accept or reject, still these plaintiffs would not be entitled to an injunction from a court of equity restraining the company from breaching its contract. This question has been definitely settled by two recent opinions of this court handed down since the decree in the instant case was made. *Schwartz* v. *Wayne Circuit Judge*, 217 Mich. 384, 186 N. W. 522; *Schwartz* v. *Cigar Makers International Union*, 219

Mich. 589, 189 N. W. 55. Both of these opinions dealt with the same litigation. They involved a much stronger case than the one now before us. There was in that case a contract for the employment of a definite number of union men for a definite period. But it is not the function of the courts to say to the employer by mandatory injunction, You must employ A. and discharge B. If A. has a contract with the employer which is breached, the court of law is always open to him to recover the damages occasioned him by its breach, but a court of equity may not by mandatory injunction thus interfere with the running of the employer's business. In the instant case the company is running an open shop, and there is no contract for the employment of any definite number of union men. The agreement, so far as it appears in the record, prescribes working conditions and certain rights of employees. Plaintiffs claim no contract with the railway company, either personally or through the brotherhoods, which binds the company to employ the plaintiffs for a single day. Under the authorities cited and upon the facts of the instant case it must be held that a court of equity is powerless to grant the relief against the Wabash here sought. The bill against the Wabash Railway Company should have been dismissed.''

Apparently the basis of the reasoning is found in the following sentences:

''A court of equity may not by mandatory injunction thus interfere with the running of the employer's business. . . . Plaintiffs claim no contract with the railway company, either personally or through the brotherhoods, which binds the company to employ the plaintiffs for a single day.''

We are of the opinion that this quotation indicates a point of view as to the respective rights of employer and employee which is rapidly passing. Both the legislatures and the courts are more and more ''interfering with the running of the employer's business'' where that business is touched with a

public interest, or involves the employment of a great number of men. The very heart of the "New Deal" policies adopted by the federal government during the last year is that the old idea of rugged individualism, wherein the employer might haughtily say, "I will do as I please with my own property, and none may interfere," has passed away, and that all private rights are held subject to public interest. The general principle which justifies this attitude is well set forth in the opinion of Chief Justice Hughes in *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 54 Sup. Ct. 231, 241, 78 L. Ed. 413, 88 A. L. R. 1481:

"It is manifest from this review of our decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity of our economic interests, have inevitably led to an increased use of the organization of society in order to protect the very bases of individual opportunity. Where, in earlier days, it was thought that only the concerns of individuals or of classes were involved, and that those of the state itself were touched only remotely, it has later been found that the fundamental interests of the state are directly affected; and that the question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends."

While the particular legal issue to which this language is applied differs greatly from the one involved herein, yet the increased use of the organization of society to protect the basis of individual opportunity and safeguard the general economic struc-

ture recognized thereby is the principle on which we base our conclusion as to the jurisdiction of a court of equity in this proceeding. If this principle applies when an attempt is made to impair a contract, much more does it do so when the court is asked to enforce a contract which the owner has deliberately entered into. Nor is this a question of compelling an unwilling party to perform personal services or to employ certain men, as was the case in *Schwartz* v. *Wayne Circuit Judge, supra,* and *Schwartz* v. *Cigar Makers International Union, supra.* There is no attempt made to interfere in the slightest degree with the right of the Company to employ or discharge men. The only request is that, so long as it does retain men in its service, it shall live up to their contracts of employment. We cannot agree with the reasoning in the case cited.

*Burger* v. *McCarthy,* 84 W. Va. 697, 100 S. E. 492, 493, does not attempt to reason the question, but merely states:

" . . . We are furthermore of the opinion that the old rule, giving preference in making runs of trains according to seniority, did not create a property right in plaintiffs such as to justify the interference by a court of equity to prevent the operation of the rule."

The case of *Chambers* v. *Davis,* 128 Miss. 613, 91 So. 346, 22 A. L. R. 114, apparently considers the issue one for the performance of personal services, for it says:

"The contract which the appellees here seek to have specifically performed is one for personal services, and it is well settled that equity will not decree the specific performance of such a contract. . . . "

As we have stated, we do not consider a question of this nature one for the performance of personal service, within the meaning of the old rule. Further,

there is a very strong and well-reasoned dissent from the opinion of the majority.

The case of *Shaup* v. *Grand International Brotherhood,* 223 Ala. 202, 135 So. 327, follows *Burger* v. *McCarthy, supra,* although it concedes that the invasion of the right of seniority is very closely akin to interference with one's calling, which was held in the case of *United States Fidelity & Guaranty Co.* v. *Millonas,* 206 Ala. 147, 89 So. 732, 29 A. L. R. 520, to constitute a wrong of which the courts would take, cognizance.

In none of the other cases cited by defendants was the question of whether the violation of seniority rights gives jurisdiction to a court of equity specifically decided.

In *McMurray* v. *Brotherhood,* (D. C.) 50 Fed. (2d) 968, 970, the question decided was to what extent the courts will interfere with the internal actions of an organization like the brotherhoods, the court saying only, in regard to whether seniority rights were property rights, that "the right is, therefore, somewhat intangible." In *Simpson* v. *Brotherhood,* 83 W. Va. 355, 98 S. E. 580, *Pratt* v. *Amalgamated Assn.,* 50 Utah 472, 167 Pac. 830, and *Hunt* v. *Dunlap,* (Tex. Civ. App.) 248 S. W. 760, the question decided was the same as in the McMurray case. As a matter of fact, this last case might be considered authority for the view we have taken, for the suit involved a mandatory injunction, as does the present one, and the court apparently assumed such a suit would lie to protect seniority rights, though its decision was based on other grounds.

The case of *Gregg* v. *Starks,* 188 Ky. 834, 224 S. W. 459, is the only case, so far as we are advised, which specifically holds that seniority rights are of such a nature that they will be protected by the injunctive processes of a court of equity, and, if we decided

cases on the mere number of precedents on the one hand or the other, we would be compelled to hold that seniority rights cannot be so protected. But, while the number of precedents may be considered, it is the convincing force of their reasoning which after all impels a court to follow authority, and we are of the opinion, after a careful review and analysis of the fundamental principles involved, that under our modern conditions, whatever may have been the rule in the past, equity will now protect seniority rights granted by contract by the use of its injunctive powers, and that the complaint on its face did state a cause of action.

The next question to consider is the plea of *res judicata*, raised by defendants as a bar to the present action. This plea is based upon the judgments in the McCaffery and Rawson suits mentioned in the statement of facts. It is the contention of defendants that those suits were what is known as class actions, and that the judgments on them are binding upon the plaintiffs in the present suits. The general principle covering cases of this kind is well stated as follows:

"Class Representation. The doctrine of 'class representation' is a well-settled principle of equity jurisprudence which has been embodied in the federal equity rules and quite generally included in Code provisions governing parties. In cases properly falling within this principle, wherein members of a class sue or are sued on behalf of other members of a class who have a common or general interest or are too numerous to be actual parties, the judgment or decree is conclusive for and against those members of the class who are thus represented, in the absence of fraud or collusion. . . . " Freeman on Judgments, vol. 1, § 436, p. 952.

It is claimed by plaintiffs, however, that suits of the nature of those involved in the McCaffery and

Rawson cases do not fall within the doctrine of class representation, that, even if they do, they are only binding on those members of the class who have participated therein or taken benefits thereunder, and that, if neither of these contentions is true, the judgments in those cases were not *res judicata* as to the matters involved in the present suits. We will consider first whether the McCaffery and Rawson suits were class in character. Paragraph 416, Revised Code of Arizona 1913 (Civil Code), which was in effect when the prior suits were brought, reads as follows:

" . . . Where the question is one of a common or general interest of many persons, *or* when the parties are numerous and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." (Italics ours.)

This statute merely sums up the rule which has long prevailed in equity, and its obvious purpose is to put to an end in one suit controversies involving many persons. It will be noted that there are two types of class suits set forth therein: (a) When the question to be determined is one of a common or general interest of many persons; and (b) when the parties are numerous and it is impracticable to bring them all before the court.

There is no doubt that the ultimate question to be determined, both by the McCaffery and Rawson suits and by the present ones, is of a common and general interest to many persons. There were at the time the previous suits were instituted some two hundred fifty trainmen in the old Tucson seniority district, whose preference right to jobs ultimately depended upon whether or not that district had been consolidated with the Phoenix seniority district. If it was so consolidated, they were all affected in one manner. If it was not so consolidated, they were all affected

in another. The same was true as to the rights of
the men working in the Phoenix seniority district.
If a seniority right is entitled to the protection of a
court of equity, and we have held it is, we think
there can be no doubt that the question which was
to be determined in the McCaffery and Rawson suits
was of a common and general interest to all of the
trainmen employed by the Company in the old Tucson
and Phoenix seniority districts. But, it is contended,
the only cases held to justify class representation
which are found in the reports all fall within three
classes: (a) Distribution of trust funds; (b) internal
management of a corporation; and (c) taxpayer's
suits. It may be that many or even all of the cases
cited by counsel as justifying class representation
do fall within one or the other of these classes, but,
as we have said before, equitable jurisdiction is not
confined merely to the type of cases where it had
heretofore been exercised, if in a new case equitable
principles apply. We are of the opinion that it is as
necessary that one party appear for a class in de-
termining the questions involved in the McCaffery
and Rawson cases as in any of the types of cases
cited by counsel, and, indeed, that the common in-
terest appeared much more plainly than in many of
the reported cases, so that the application of the doc-
trine of class representation clearly was justified.
There is no doubt that counsel for plaintiffs in those
suits intended them as such, for they carefully and
elaborately stated in their complaints that they were
brought for that purpose. There is no doubt that
the vast majority of the trainmen in Tucson believed
they were so brought, for a fund was raised in
Tucson among the engineers and firemen to pay the
expenses of the suit, and practically every member
of the brotherhoods in that district was solicited to
contribute thereto.

The next question is whether the plaintiffs in this particular action are bound by the decrees in the previous suits. The record shows that they were all members of the brotherhoods in the Tucson seniority district at the time of the McCaffery and Rawson suits, and were affected in precisely the same manner as the plaintiffs therein by the result; that they knew of the existence of those suits, and were solicited to contribute to the expenses thereof, but that they refused to do so, or to take any part in their prosecution. Under such circumstances, are they bound by the judgments rendered? Plaintiffs urge that only those who accept the representation, either by joining in the suit or seeking to share the fruits of the judgment, are so bound, and in support of that rule cite the following text from Corpus Juris:

"It is the general rule of equity, and under statutory provisions in many jurisdictions, that one person or more may sue or defend for all where the question is one of a common or general right, or when the parties are so numerous that it is impracticable to bring them all before the court. And the judgment in such case will be binding on all persons belonging to the class so represented; if they accept the representation and connect themselves with the litigation, either by coming into the suit or seeking to share the fruits of the judgment, or by acquiescing in it. In all cases of this character, the right to protect which the suit is brought must be one which exists against all, or the obligation which it is sought to enforce must be common to all. But the judgment can have no binding effect on those who do not participate in the proceedings, prove their claims, or otherwise join in the proceedings." 34 C. J., § 1422, p. 1002.

We have examined all of the cases cited as supporting that text, and those cited in plaintiffs' brief, but they are too numerous to discuss and analyze without extending an already long opinion unduly.

The federal cases obviously are not in point, for the reason that the equity rules of the Supreme Court of the United States, at the time the decisions referred to were made, expressly provided that in class suits the decree should be without prejudice to the rights and claims of the absent parties. Of course, under such a rule only those actually made parties to the suit were bound by it, but this practically destroyed the entire purpose and value of class representation, and in 1912 the Supreme Court of the United States revised its rule and left out the saving clause. In the case of *Supreme Tribe of Ben-Hur* v. *Cauble,* 255 U. S. 356, 41 Sup. Ct. 338, 341, 65 L. Ed. 673, decided after the change in the rules, the court called particular attention to this fact, and held that a class suit would bind all persons of the class, even though they were not actually represented in the suit. We quote from that case as follows:

"Class suits have long been recognized in federal jurisprudence. In the leading case of *Smith* v. *Swormstedt,* 16 How. (U. S.) 288, 303, 14 L. Ed. 942, 948, of such suits this court said:

" 'Where the parties interested in the suit are numerous, their rights and liabilities are so subject to change and fluctuation by death or otherwise, that it would not be possible, without very great inconvenience, to make all of them parties, and would oftentimes prevent the prosecution of the suit to a hearing. For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court. The legal and equitable rights and liabilities of all being before the court by representation, and especially where the subject-matter of the suit is common to all, there can be very little danger but that the interest of all will be properly protected and maintained.'

"The subject is provided for by rule 38 of the equity rules of this court promulgated in 1912, which

reads: 'When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole.' (226 U. S. 659, 33 Sup. Ct. xxix, 57 L. Ed. 1643.) As the rule formerly read, it contained the following provision: 'But in such cases the decree shall be without prejudice to the rights and claims of the absent parties.' . . .

"The change in rule 38 by the omission of the qualifying clause is significant. It is true that jurisdiction, not warranted by the Constitution and laws of the United States, cannot be conferred by a rule of court, but class suits were known before the adoption of our judicial system, and were in use in English chancery. Street's Federal Equity Procedure, vol. 1, § 549.

"The District Courts of the United States are courts of equity jurisdiction, with equity powers as broad as those of state courts. That a class suit of this nature might have been maintained in a state court, and would have been binding on all of the class, we can have no doubt. (Citing cases.)

"Owing to the number of interested parties and the impossibility of bringing them all before the court, the original suit was peculiarly one which could only be prosecuted by a part of those interested suing for all in a representative suit. Diversity of citizenship gave the District Court jurisdiction. Indiana citizens were of the class represented, their rights were duly represented by those before the court. The intervention of the Indiana citizens in the suit would not have defeated the jurisdiction already acquired. *Stewart* v. *Dunham*, [115 U. S. 61, 5 Sup. Ct. 1163, 29 L. Ed. 329], *supra*. Being thus represented, we think it must necessarily follow that their rights were concluded by the original decree.

"Rule 38, as amended, was intended to apply to just such cases. Rule 39 does not apply to a subject already specifically covered in rule 38. Of course, mere considerations of inconvenience cannot confer jurisdiction, but it is to be noted that if the Indiana citizens are not concluded by the decree, and

all others in the class are, this unfortunate situation may result in the determination of the rights of most of the class by a decree rendered upon a theory which may be repudiated in another forum as to a part of the same class.

"If the federal courts are to have the jurisdiction in class suits to which they are obviously entitled, the decree when rendered must bind all of the class properly represented. The parties and the subject-matter are within the court's jurisdiction. It is impossible to name all of the class as parties, where, as here, its membership is too numerous to bring into court. The subject-matter included the control and disposition of the funds of a beneficial organization, and was properly cognizable in a court of equity. The parties bringing the suit truly represented the interested class. If the decree is to be effective and conflicting judgments are to be avoided, all of the class must be concluded by the decree."

The majority of the other cases cited by plaintiffs are not in point, for one reason or another, but the Supreme Court of California, in *Haese* v. *Heitzeg et al.*, 159 Cal. 569, 114 Pac. 816, does specifically hold as contended by them. With all due respect for the decision of that court, we are of the opinion that such a conclusion practically destroys the beneficial effect of class suits, for under it a suit might be brought by one as representative of a class, and all the other members of that class await the result of the action. If it were favorable, they could immediately take advantage of the decision. If it were unfavorable, not being parties to the suit, they would not be bound thereby, and could relitigate the same issues. The result of holding that only the parties who had actually participated in the McCaffery and Rawson suits are bound by those judgments would be to introduce confusion of the worst kind into the seniority rights of the railroad men of the Tucson lodges, and, indeed, make such rights almost unwork-

able.   McCaffery and Rawson admittedly are bound by those judgments, and, if they are true class suits, so are the men who contributed to the expense thereof. The judgments therein held there is no consolidation of the Tucson and Phoenix seniority districts, while those in the cases at bar held such consolidation has been made.  If the rule of *res judicata* does not apply to plaintiffs, some of the members of the brotherhoods would have their seniority based on the existence of one seniority district, while others would have theirs based on the existence of two districts.  McCaffery and Rawson, and those who contributed to their suits, though older in point of service, might have poorer runs than many of their juniors in date of employment, who were not bound by the judgments in those suits, and it would be almost impossible for the Company to prepare a seniority list correctly representing the conflicting rights.  It is obvious that such a situation would result in endless confusion, rivalry, and dissatisfaction.  Of course, if the law were clearly as contended by plaintiffs, we would have no other option than to apply it, regardless of the consequences, but we give some of these consequences merely as an illustration of one of the reasons why the better rule is that all parties having a common interest are bound by the decree.  We are of the opinion that the correct rule is laid down in the Cauble case, *supra,* and that, in the absence of fraud and collusion on the part of the plaintiffs representing a certain class in a suit, all of the members of that class are bound by the judgment rendered therein.

But, even assuming that the decrees in the McCaffery and Rawson cases are *res judicata* as against the plaintiffs in the present suits, the latter contend that the issues in the former cases were so different from those involved in the present ones that they do

not preclude plaintiffs from maintaining the latter. We must therefore determine to what extent the judgments in the former suits are *res judicata* in the present ones. We have had a similar question before us several times, and in the case of *Fischer* v. *Hammons,* 32 Ariz. 423, 259 Pac. 676, 678, stated the rule as follows, quoting from 34 C. J. 909:

"The rule is often stated in general terms that a judgment is conclusive not only upon the questions actually contested and determined, but upon all matters which might have been litigated and decided in that suit; and this is undoubtedly true of all matters properly belonging to the subject of the controversy and within the scope of the issues, so that each party must make the most of his case or defense, bringing forward all his facts, grounds, reasons, or evidence in support of it, on pain of being barred from showing such omitted matter in a subsequent suit; and it is also true that where the second suit is upon the same cause of action all matters which might have been litigated are conclusively settled by the judgment; and that generally the estoppel applies where defenses which were available in the first action but not then set up are sought to be used in a second action either by way of defense or as the foundation of a claim for relief. But the weight of authority is that where the second action, although between the parties, is on a different cause of action, the judgment is not conclusive on all matters which might have been litigated in the former action, but only as to such points or questions as were actually in issue and adjudicated therein."

Defendants contend that the McCaffery and Rawson judgments are *res judicata* not only as to all the matters which were actually litigated and determined therein, but as to all those which could have been so litigated and determined, while plaintiffs urge that, even admitting this action is between the same parties, it is on a different cause of action, and therefore conclusive only on the points and questions

which were actually in issue and adjudicated in the former cases. Assuming, without deciding, that plaintiffs are right in their contention that the cause of action herein is upon a different claim or demand, and that the judgments in the first suits were therefore only binding in regard to the matters actually litigated, let us examine the record regarding those suits, and determine what issues were raised and were necessarily determined in order to arrive at the judgments rendered. Since the McCaffery and Rawson suits were identical in character, we discuss merely the latter, for the rule applying to it will, of course, apply with equal force in the former. The complaint, after setting forth in full the nature and business of the Company, the nature and business of the brotherhoods and their officers, and of the subordinate lodge of firemen and the individual defendant firemen, refers to the contract between the Company and the Firemen which was in effect as of September 1, 1924, and describes the general principles of seniority, and then alleges that the agreement between the Company and the Firemen, and the individual members of said brotherhood, establishes various seniority districts, and among them "a district known as the 'Tucson district,' being the lines between Yuma and El Paso, including the lines of the former Arizona Eastern Railway Company." It then proceeds to describe plaintiff's right of seniority, and alleges it is superior to those of the various individual defendants. It then alleges that the Company, acting at the request of the officers of the brotherhoods, about May 26, 1927, made certain orders in regard to plaintiff's seniority, which were not in accordance with the contract between the Company and the defendants.

The vital point of the complaint is the allegation that at the time the suit was filed, by the terms of the

contract, there was but one seniority district existing on the lines of the Company between Yuma and El Paso, which included the former Arizona Eastern, and therefore the old Phoenix seniority district. In other words, his claim is that at the time of his suit the old seniority districts had been merged into one. If this were true, then the only remaining question was the respective dates of employment of the plaintiff and defendants employed by the Company, regardless of which seniority district they had previously worked in.

The defendants answered and set up, first, that the contract then existing between the Company and the plaintiff provided that the Tucson seniority district was described as follows: "Tucson district including the original main line of the Southern Pacific between Yuma and El Paso via Gila, Maricopa, and Bowie, including the Nogales Branch," and, second, that there was another seniority district described as the "Phoenix district including the former Arizona Eastern Railroad from Maricopa to Phoenix and all lines extending out of Phoenix." It further alleged that, under the contract which provided for two seniority districts as above stated, the chief executives of the brotherhoods, in accordance with the constitution thereof, had made a decision in regard to the application of the seniority rules, based on such two districts, on or about May 4, 1927, and that the Company was complying with such decision of the chief executives. It was absolutely necessary to determine, in order to decide whether Rawson's claim of an invasion of his seniority rights was well founded, whether there were one or two seniority districts on the lines operated by the Company between Yuma and El Paso at the time the Rawson suit was brought. If there was but one, admittedly he was entitled to recover, for with but one seniority

district there was no place for controversy in regard to lap mileage or diversion of traffic rules; the only question under such circumstances being the date at which the respective individuals involved in the suits had commenced working for the Company. If, however, the decision on this point was adverse to Rawson, it would not necessarily determine the suit against him, for the question would then arise as to whether, as between the men in the Phoenix seniority district and the men in the Tucson seniority district, the so-called lap mileage rule should apply, or the diversion of traffic rule, and the amount of mileage in each district. Admittedly this last was a matter which had to be decided by the chief executives in accordance with the constitution, statutes, and rules of the two brotherhoods, the Company accepting their decision on this point as final. It was for this reason the answers alleged that this question had been submitted to the proper officials of the brotherhoods, and by them decided as of May 4, 1927. The judgment of the trial court was that plaintiff take nothing, and the defendants have judgment for their costs. In order to render this judgment, the court was compelled to decide the issue in regard to the number of seniority districts existing, by holding that there were two instead of one, as claimed by the plaintiff, and by holding that the question of which runs were to be credited to Phoenix seniority district, and which runs to the Tucson seniority district, which were necessarily based upon the division of mileage of new track between the districts and the application of either the lap mileage or diversion of traffic rule, was properly determined by the chief executives in their decision of May 4, 1927. It necessarily follows from what we have previously stated that the question as to whether at the time of the filing of the Rawson suit there was in legal existence one or two seniority districts is *res judicata* as against the

plaintiffs in the present action to the effect that there were two seniority districts, the Tucson district and the Phoenix district, as they were described in defendants' answer in that case. It is also necessarily *res judicata* that the decision of the grand officers of the brotherhoods as of May 4, 1927, on the question of the division of new mileage and the application of the lap mileage rule was made properly and in accordance with the constitution, statutes and rules of such brotherhoods.

The last remaining question we need discuss is whether the allegations in the present suits in regard to fraud are sufficient to allow plaintiffs to relitigate the matters which we have held to be *res judicata*.

The material allegations of fraud are contained in paragraphs XLI, XLV and XLVI of plaintiffs' complaint, which we have set forth in full hereinbefore; all others being in substance a repetition or enlargement thereof. The only one which can be considered in any manner as attacking the decision of the trial court that there were two seniority districts in existence when the McCaffery and Rawson suits were brought is paragraph XLVI. On examining this paragraph, it will be seen that the allegations are, first, that the restoration of the seniority rights on the basis of two districts was "wrongful, arbitrary, fraudulent, illegal. . . . " These allegations are of course mere words, and mean nothing in the eyes of the law, unless they are aided by specific statements of what it was that constituted the fraud complained of. The only thing which is alleged in aid of this language is that the restoration of the two seniority districts was made in violation of the contract between the company and the brotherhoods, and contrary to the constitution and by-laws of such brotherhoods. But this again is merely a claim that

the trial court in its decision as to the legality and meaning of the contracts existing between the Company and the brotherhoods was mistaken. Such an allegation in nowise is a basis for an action of fraud. It is merely a statement that the court has erred in construing a contract and in determining whether the agents who made it acted within the scope of their authority. We think the pleadings of plaintiffs are not sufficient to entitle them to maintain this suit on the theory that the decision of the trial court that two seniority districts existed was tainted by fraud. It may be said this allegation does not attack the judgment of the trial court, but the actions of the officers of the brotherhoods. But these actions admittedly culminated in a contract with the Company attempting to restore the two seniority districts, and the meaning of such contract and the right of its makers to bind the brotherhoods was necessarily passed on and concluded by the court in its judgment. The allegations of the other two paragraphs of the complaint quoted are an attempt to attack the decision of May 4, 1927. This decision in no manner decides the question as to whether there was one or two seniority districts, but assumes as a matter of course that there are two, and then proceeds to divide the new trackage between those districts, and to decide whether the lap mileage or diversion of traffic rule should apply over this new track, and determines the extent to which each seniority district should be given credit for runs made over the new track. The allegations are that the purported findings of fact in that decision are false and made with the intent to deprive the plaintiffs of their seniority rights, and that they were made in bad faith, in that the decision was not really made by the chief executives, but by their subordinates. These allegations are in substance a claim that the evidence upon which

the trial court acted in its determination as to the meaning and validity of such decision in the former suits was false. It is the universal rule that a judgment may not be impeached collaterally on the ground that the testimony on which it was based was false or perjured, unless the fraud goes to the jurisdiction of the court. *Giffen* v. *Christ's Church*, 48 Cal. App. 151, 191 Pac. 718; *Gray* v. *McKnight*, 75 Okl. 268, 183 Pac. 489; *Greene* v. *Greene*, 2 Gray (Mass.) 361, 61 Am. Dec. 454; *Aparicio* v. *New England Equitable Ins. Co.*, 177 App. Div. 551, 164 N. Y. Supp. 114; Id., 221 N. Y. 629, 117 N. E. 1060; 34 C. J. 566.

We are of the opinion that what is in effect a collateral attack upon a judgment cannot be made on allegations of this nature. Generally speaking, the only character of fraud which authorizes such an attack is where it appears on the face of the record, goes to the method of acquiring jurisdiction, or was practiced in the act of obtaining the judgment itself, none of which appears in the pleadings in the present proceedings.

But, even were the allegations of the complaint, by the broadest interpretation thereof, considered as authorizing the plaintiffs to attempt to show that the judgments in question were obtained by fraud, there is nothing which we have been able to discover in the evidence which would in the remotest degree even tend to raise a reasonable suspicion of actionable fraud. The record shows clearly that the general chairmen, who made all the agreements with the Company in regard to the seniority districts, were chosen by general committees, the very large majority of whose members came from seniority districts of the Southern Pacific Railroad in no way interested or involved in this controversy; that the entire matter in controversy was given repeated hearings by representatives of the international

brotherhoods, at which all parties were given full opportunity to present their views; that during these different proceedings at least seven different grand officers of the two brotherhoods passed on the various matters involved herein, either by hearing the evidence themselves directly or by reviewing written reports and arguments from many different sources, and, with the sole exception of one instance, when one of the chief executives was inclined to the opinion that a vote of the men in the districts involved was not necessary in order to merge seniority districts (an opinion which he apparently changed later), the conclusions of the grand officers were unanimous on practically every material point involved, from the beginning of the controversy to the end. It would seem that it would require the clearest and strongest of proof even to raise a suspicion that so many different disinterested men, occupying positions of trust in their respective orders, and presumably administering those positions with fairness to all of the members of the brotherhoods, and with no apparent reason for acting improperly, would conspire falsely and fraudulently to deprive the members of the two local lodges of one of their most valuable rights. Indeed, the finding of the jury, adopted by the trial court, was that there was no intention on the part of any of the grand officers to violate any of the rules of the brotherhoods, and the only material matter which the court finds specifically to be false (not fraudulent) in the entire transaction is the assumption by the chief executives in their decision of May 4, 1927, that there were two seniority districts then existing. How an honest belief that the proper interpretation of the constitution and rules of the brotherhoods had been applied to undisputed facts, and the assumption that, as a matter of law resulting therefrom, two seniority districts existed,

can be characterized as actionable fraud is beyond our understanding.

We have carefully read all of the cited cases and have examined the abstract and transcript of testimony bearing on the questions of law and fact material for a decision in this case. We do not discuss many of the assignments of error and matters argued in the briefs, for the reason that, in view of the conclusions stated in this opinion, they are immaterial. It is indeed to be regretted that a matter of this kind should come before the courts. It obviously should have been settled by the brotherhoods, since the defendant company has at all times expressed its willingness to adopt any course of action upon which these organizations could agree. But, since some of the members of the orders insisted upon an appeal to the courts, we must determine that appeal upon the general principles of law applicable to the issues as they appear in the record.

For the reason that the matters in controversy in the present suits which plaintiffs must have resolved in their favor in order to prevail were placed in issue in previous actions, and fully adjudicated therein against the contentions of plaintiffs, and since such adjudications have become final, the judgment of the superior court of Pima county is reversed and the case remanded, with instructions to render judgment in favor of the defendants.

ROSS, C. J., and McALISTER, J., concur.