IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

_____

IN RE THE MARRIAGE OF

MAURICIO FERNANDEZ MARGAIN,
*Petitioner/Appellant*,

*and*

ELSA LOURDES RUIZ-BOURS,
*Respondent/Appellee*.

No. 2 CA-CV 2015-0067
Filed April 22, 2016

_____

Appeal from the Superior Court in Pima County
No. D20143642
The Honorable Ken Sanders, Judge Pro Tempore

**REVERSED AND REMANDED**

_____

COUNSEL

Gerald D. Sherrill, Scottsdale
*Counsel for Petitioner/Appellant*

Ann Nicholson Haralambie, Attorneys, P.C., Tucson
By Ann M. Haralambie
*Counsel for Respondent/Appellee*

---

## OPINION

Judge Staring authored the opinion of the Court, in which Presiding Judge Howard and Judge Espinosa concurred.

---

S T A R I N G, Judge:

**¶1**        Mauricio Fernandez Margain appeals the denial of his petition for expedited enforcement of a child custody determination made in Mexico.  Margain contends the trial court erred because Mexico has exclusive jurisdiction over the child at issue.  We have jurisdiction over this matter pursuant to A.R.S. §§ 12-120.21(A)(1) and 25-1064.  For the reasons discussed below, we reverse.

### Factual and Procedural Background

**¶2**        "We view the record in the light most favorable to upholding the trial court's decision." *Duwyenie v. Moran*, 220 Ariz. 501, ¶ 2, 207 P.3d 754, 755 (App. 2009).  In September 2007, Margain and Elsa Lourdes Ruiz-Bours were married in Hermosillo, Sonora, Mexico.  The couple subsequently moved to Coronado, California, where their only child, Sophia, was born in July 2008.  The family continued to live in California until October 2010, when Ruiz-Bours and Sophia traveled to Hermosillo.  The parties dispute the purpose of the trip, but, as they stipulated below, Ruiz-Bours and the child were "in Hermosillo . . . from October 11, 2010 through at least July 5, 2012."

**¶3**        In August 2011, Margain filed for dissolution of the marriage in the Second Family Court of Tijuana, Baja California, Mexico, asserting the ground of abandonment.  As of that time, Sophia had been living in Mexico for at least six consecutive months.  Ruiz-Bours was properly served with notice of the dissolution proceeding in October 2011.  At the time of service, Ruiz-Bours was aware that the Second Family Court had ordered that she not remove Sophia from Hermosillo without that court's approval.

¶4 Ruiz-Bours challenged the jurisdiction of the Second Family Court, arguing jurisdiction properly lay in Sonora, not in Baja California, as both she and Sophia were living in Hermosillo. The Second Family Court stayed the proceedings and the matter was referred to the State Appellate Court of Baja California to address Ruiz-Bours's jurisdiction challenge. In May 2012, the State Appellate Court affirmed the Second Family Court's jurisdiction.

¶5 Ruiz-Bours then pursued her jurisdiction challenge in Mexico's federal court system. She was denied relief by the Second District Court in July 2012, and the Fifteenth Circuit Court in January 2013. The Supreme Court of Mexico denied Ruiz-Bours relief in June 2014, affirming jurisdiction in the Second Family Court. Ruiz-Bours was represented by counsel throughout these proceedings and "had proper notice of the Mexican proceedings and was provided due process throughout."

¶6 In July 2012, in the midst of her appeals, Ruiz-Bours violated the Second Family Court's order, and absconded with Sophia to Tucson. In September 2014, that court issued its final judgment, in which Margain was awarded "definitive legal custody" of Sophia. In reaching its judgment, the court considered the best interests of the child, specifically stating:

> [T]he minor is wrongfully held while continuing to be under the care of the mother . . . who is neglecting the father-child relationship of her minor daughter with her father, which without any doubt, is causing an imminent harm for the little girl; and in spite of having been warned with fines, aid from law enforcement, search warrant and arrest for up to thirty six hours, . . . she insisted on her disobedient behavior of not allowing the safeguarding of the wellbeing of her minor daughter, by obstructing the visitation/interaction between father and daughter, causing harm in her little girl by depriving her of the aforementioned right

> of enjoying of times in common with her
> father . . . with said harm prevailing for
> over one year . . . .
>
>      . . . .
>
>      . . . Therefore, it should be decreed
> that the definitive legal custody of the
> aforementioned minor shall be exercised by
> her father . . . , who shall watch over for the
> health, safety as well as guide and take care
> of the most elemental needs of his minor
> daughter such as adequately providing her
> with care and [advice].

Ruiz-Bours did not file an appeal or any other post-judgment motions to have the judgment set aside.

¶7 In October 2014, Margain filed a "Petition for Expedited Enforcement of Child Custody Determination" in Pima County Superior Court seeking the "immediate physical custody of" Sophia. The trial court ordered Ruiz-Bours to appear with the child.

¶8 At a November 2014 hearing, the court found that to date Margain had complied with the requirements of due process. The court also allocated parenting time for Margain. Both Ruiz-Bours and Margain were ordered not to remove the child from Pima County absent a written agreement, or from the state of Arizona absent a written agreement and leave of court.

¶9 In December 2014, another hearing was held at which the court made rulings on pending motions and factual findings. By stipulation of the parties, the court found Ruiz-Bours and the child "were in Hermosillo, Sonora, Mexico, from October 11, 2010 through at least July 5, 2012." The court further found the filing date for the Mexican petition for dissolution of marriage had been August 23, 2011, and the child had been in Mexico "for at least six consecutive months preceding the August 2011 date of [Margain's] filing for dissolution in Mexico." The court also noted it would limit the scope of the trial to determining "whether Mexico exercised

jurisdiction in substantial conformity with the Uniform Child Custody Jurisdiction and Enforcement Act" (UCCJEA), A.R.S. §§ 25-1001 through 25-1067.

¶10         A three-day trial occurred in February 2015, during which both parties elicited expert testimony concerning the proper exercise of jurisdiction pursuant to Mexican law.  Despite the ruling of the Mexico Supreme Court, Ruiz-Bours contended the Second Family Court did not have jurisdiction to entertain the dissolution proceedings initiated by Margain because the action had not been filed in the state of her domicile.  Margain, on the other hand, presented the testimony of his expert witness who agreed that while the general rule in Mexican dissolution actions is that the competent forum is that of the marital or conjugal residence, when the claim is abandonment the competent forum is the domicile of the abandoned spouse.  After the presentation of evidence and argument, the court took the matter under advisement.

¶11         The trial court denied Margain's petition on March 2, 2015.  In its ruling, the court indicated the Second Family Court's exercise of jurisdiction was proper under the laws of Mexico, stating: "[I]t is hard to conceive of how the legitimacy of that court's jurisdiction could have been more unequivocally established, under the laws of Mexico."  The court also recognized "Mexico would have been [the child's] home state at the time" Margain filed his petition for dissolution.  But because under Mexican law "jurisdiction is based on the location of the *marital residence* or, in cases of abandonment, the *residence of the abandoned spouse*," and because "[a]t no time did the Second Family Court consider where *Sophia* was living," the court concluded the Second Family Court did not make its custody determination in substantial conformity with the jurisdictional standards of the UCCJEA.  As part of its ruling, the court ordered that both sides would bear their own costs and attorney fees.

¶12         Ruiz-Bours filed a timely motion for new trial on the issue of costs and attorney fees.  On the same day, Margain filed his notice of appeal from the court's March 2 ruling.  The trial court then issued a ruling stating it lacked jurisdiction to consider Ruiz-Bours's motion for new trial because Margain had filed his notice of appeal

before the motion was filed. Ruiz-Bours filed a motion for reconsideration of the court's ruling and Margain filed a response agreeing that filing the notice of appeal did not divest the trial court of jurisdiction to address Ruiz-Bours's motion for new trial.

¶13 The trial court granted Ruiz-Bours's motion for new trial on the limited issue of costs and attorney fees. In July 2015, we stayed appellate proceedings pending a final judgment on the issue of costs and attorney fees, which the trial court subsequently awarded to Ruiz-Bours in a total amount of $73,462.28. Margain filed an amended notice of appeal to encompass the award. We then vacated the stay and reinstated the appeal.

¶14 In August 2015, Ruiz-Bours filed a motion to dismiss Margain's appeal, asserting he had "kidnapped" Sophia and taken her to Mexico in violation of the trial court's November 2015 order. We denied the motion and Ruiz-Bours subsequently filed a motion to supplement the record, which we granted. In her supplement, Ruiz-Bours provided a minute entry from the trial court finding Margain had failed to return the child after a scheduled visit and holding him in contempt of court.

## Analysis

### Dismissal

¶15 We first address whether we should render a decision on Margain's appeal at all. Ruiz-Bours argues Margain, who was found to be in contempt of court for absconding with Sophia, has forfeited his right to appeal. *See Stewart v. Stewart*, 91 Ariz. 356, 360, 372 P.2d 697, 700 (1962) (appellate court enjoys discretion to dismiss appeal when appellant has disregarded trial court orders).

¶16 In *Stewart*, the husband repeatedly failed to make court-ordered payments of spousal support and attorney fees and repeatedly failed to appear at hearings. *Id.* at 357, 372 P.2d at 698. The trial court found him in contempt and issued a warrant for his arrest. *Id.* After the husband was served with an order to show cause, he again failed to appear. *Id.* The husband then sought "aid from the appellate branch of the same judicial process he [had]

repeatedly scorned at other levels." *Id.* at 358, 372 P.2d at 699. While noting the decision whether to dismiss was discretionary and would "depend on the facts of each case," the *Stewart* court concluded dismissal was "clearly warranted" by the facts before it. *Id.* at 360, 372 P.2d at 700.

¶17 An appellate court exercises its contempt powers when it dismisses the appeal of a party who is in "flagrant and contumacious disregard" of trial court orders. *See id.* at 357, 360, 91 P.2d at 698, 700; *see also Sheehan v. Flower*, 217 Ariz. 39, ¶ 17, 170 P.3d 288, 292 (App. 2007) ("[A] court may exercise its inherent contempt power to remedy a violation of a court order."); 17 Am. Jur. 2d *Contempt* § 1 (2016) ("One of the most important and essential powers of a court is the authority to protect itself against those who disregard its dignity and authority, and this authority is appropriately administered through the court's power to punish by contempt."); Dan. B. Dobbs, *Handbook on the Law of Remedies* § 2.9, at 100 (1973) ("One kind of [contempt] penalty sometimes levied upon a contumacious party is a denial of his right to litigate."). An appellate court may punish contempt pursuant to its "inherent powers . . . as [is] necessary to the ordinary and efficient exercise of jurisdiction." *State ex rel. Andrews v. Superior Court*, 39 Ariz. 242, 247-48, 5 P.2d 192, 194 (1931), *overruled on other grounds by Genda v. Superior Court*, 103 Ariz. 240, 242, 439 P.2d 811, 813 (1968); *see also Stewart*, 91 Ariz. at 358, 372 P.2d at 699, *quoting Nat'l Union of Marine Cooks & Stewards v. Arnold*, 348 U.S. 37, 45 (1954) ("The United States Supreme Court has ruled that dismissal of a contumacious appellant's appeal . . . is a 'reasonable' method of . . . 'sustaining the effectiveness of a state's judicial process . . . .'").

¶18 As noted above, however, whether to impose the sanction of dismissal is discretionary and "depend[s] on the facts of [the] case." *Stewart*, 91 Ariz. at 360, 372 P.2d at 700. In the case of a contumacious party, whether to dismiss is similar in nature to a decision in equity, making it helpful to consider equitable principles. *See Grand Int'l Bhd. of Locomotive Eng'rs v. Mills*, 43 Ariz. 379, 398, 31 P.2d 971, 978 (1934) ("When a new condition arises and the legal remedies afforded are inadequate, the never-failing capacity of equity to adapt itself to the situation will be found equal to the

emergency."); Dobbs, *supra*, § 2.1, at 28 ("[A] case is sometimes referred to as equitable in the rather loose sense that it involves questions of discretion, or judgment, or calls for principles of justice and conscience rather than rigid 'legal' rules.").

**¶19** "It is a cardinal rule of equity that he who comes into a court of equity seeking equitable relief must come with clean hands." *MacRae v. MacRae*, 57 Ariz. 157, 161, 112 P.2d 213, 215 (1941). The maxim can be summarized as follows:

> [W]henever a party, who, as *actor*, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him *in limine*; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.

*Sines v. Holden*, 89 Ariz. 207, 209-10, 360 P.2d 218, 220 (1961), *quoting* 2 Pomeroy 91, *Equity Jurisprudence*, § 397 (5th ed.); *see also* 27A Am. Jur. 2d *Equity* § 98 (2016) ("The equitable doctrine of clean hands expresses the principle that where a party comes into equity for relief he or she must show that his or her conduct has been fair, equitable, and honest as to the particular controversy at issue.").

**¶20** In this case, both Ruiz-Bours and Margain have unclean hands, and have acted outrageously. Margain sought a divorce and custody of Sophia in Mexico, the country in which Ruiz-Bours and Sophia had been located for approximately ten months before Margain initiated the proceedings. He followed the required procedures in that country, was challenged, and won on appeal. Ruiz-Bours, however, in violation of the Second Family Court's order, absconded with Sophia to Arizona. Thus, while we in no way condone Margain's recent contempt, absconding with Sophia, we cannot ignore the fact Ruiz-Bours seeks to have Margain's appeal dismissed as a sanction for the very same misconduct she committed when she brought Sophia to Arizona. This case would not have arisen before us but for Ruiz-Bours's violation of the Second Family

Court's order not to remove Sophia. We will not impose the sanction of dismissal under these circumstances.

**Enforcement under the UCCJEA**

**¶21** Because this matter "involves a matter of statutory interpretation," we conduct de novo review. *Melgar v. Campo*, 215 Ariz. 605, ¶ 6, 161 P.3d 1269, 1270 (App. 2007). The "primary goal of statutory interpretation is to find and give effect to legislative intent." *Mathews ex rel. Mathews v. Life Care Ctrs. of America, Inc.*, 217 Ariz. 606, ¶ 6, 17 P.3d 867, 869 (App. 2008). The plain language of a statute is the best indication of that intent. *Id.* When "a statute's language is clear and unambiguous, we apply it without resorting to other methods of statutory interpretation." *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994). Also, in construing a statute, we do so "in a way that promotes consistency, harmony, and function. If possible, each word or phrase must be given meaning so that no part is rendered void, superfluous, contradictory or insignificant." *Welch-Doden v. Roberts*, 202 Ariz. 201, ¶ 22, 42 P.3d 1166, 1171 (App. 2002) (citations omitted).

**¶22** The UCCJEA, as enacted in Arizona, contains several provisions relating to the enforcement of child custody determinations. At issue in this matter is how courts are to treat child custody determinations made in foreign countries.

**¶23** The UCCJEA addresses the effect to be given to child custody determinations made in foreign countries in § 25-1005(B), which provides that "a child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of [the UCCJEA] must be recognized and enforced." The UCCJEA further provides, "A court . . . shall recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this chapter or the determination was made under factual circumstances meeting the jurisdictional standards of [the UCCJEA]." § 25-1053(A). Foreign countries are to be treated as if they are "state[s] of the United States" for resolving questions of jurisdiction. § 25-1005(A). The plain language of these

provisions leads us to conclude that jurisdiction to determine custody of Sophia lies exclusively in the courts of Mexico.[1]

¶24 The UCCJEA focuses on a "home state" analysis in determining whether Arizona courts have jurisdiction to make an initial child custody determination. *See* § 25-1031(A). This is because the UCCJEA provides Arizona has jurisdiction to make an initial custody determination only if any of the following apply:

1. This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state.

2. A court of another state does not have jurisdiction under paragraph 1 or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under § 25-1037 or 25-1038 and both of the following are true:

(a) The child and the child's parents, or the child and at least one parent or person acting as a parent, have a significant

---

[1] On the day before oral argument in this court, Ruiz-Bours filed a motion to supplement the record, attaching "a Mexican *amparo* order and translation." She asserts the *amparo* amounts to a "finding that the trial judge in Tijuana had not complied with proper procedures regarding granting [Margain] custody" and that "the validity and finality of the Mexican custody order is at issue." We have considered the *amparo*, and do not find its effect to be as evident as Ruiz-Bours asserts. Moreover, any determination of its impact is best left to the courts of Mexico.

connection with this state other than mere physical presence.

(b) Substantial evidence is available in this state concerning the child's care, protection, training and personal relationships.

3. All courts having jurisdiction under paragraph 1 or 2 have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under § 25-1037 or 25-1038.

4. A court of any other state would not have jurisdiction under the criteria specified in paragraph 1, 2 or 3.

§ 25-1031(A). The "home state" under the UCCJEA is "the state in which a child lived with a parent . . . for at least six consecutive months immediately before the commencement of a child custody proceeding, including any period during which that person is temporarily absent from that state." § 25-1002(7)(a).

¶25 Here, the trial court analyzed the various subsections of the UCCJEA to mean, "if the child custody determination of the [foreign country] was entered 'in substantial conformity with the jurisdictional standards' of the UCCJEA, it is enforceable. If it was not, it is not enforceable." The court noted "[t]he Second Family Court's exercise of jurisdiction may have been entirely proper under the laws of Mexico. . . . That does not mean, however, that it properly exercised jurisdiction under the UCCJEA." Dispositive to the court was the jurisdictional analysis conducted by the Mexican courts, which based jurisdiction "on the location of the *marital residence*," or, when applicable, "the *residence of the abandoned spouse*," and did not take the residence of the child into consideration. Thus, because where Sophia "lived was clearly irrelevant to the jurisdictional analysis under Mexican law," the trial court concluded "the custody determination made by the Second Family Court was

[not] made 'in substantial conformity with the jurisdictional standards' of the UCCJEA."

¶26        Under the UCCJEA, however, child custody determinations made in foreign countries "must be recognized and enforced" if they were made "under *factual circumstances* in substantial conformity with the jurisdictional standards" of the UCCJEA.  § 25-1005(B) (emphasis added).  Notably, an analysis of factual circumstances is also required by § 25-1053(A), which requires enforcement of a child custody determination of a court of another state (foreign countries being treated as states under § 25-1005(A)) "if the latter court exercised jurisdiction in substantial conformity" with the jurisdictional standards of the UCCJEA "*or* the determination was made under *factual circumstances* meeting the jurisdictional standards of [the UCCJEA]."  § 25-1053(A) (emphasis added).  Thus, whether examining a child custody determination made by a court in another state or another country, the plain language of the UCCJEA instructs Arizona courts to examine the factual circumstances under which the non-Arizona court exercised jurisdiction.

¶27        The trial court, in contrast, analyzing whether the Second Family Court exercised jurisdiction "in substantial conformity" with the UCCJEA, only considered the legal circumstances under which the court exercised jurisdiction and did not consider the factual circumstances.  This had the effect of disregarding § 25-1005(B) and rendering the "factual circumstances" portion of § 25-1053(A) void, superfluous, and insignificant.  As noted above, "[i]f possible, each word or phrase [of a statute] must be given meaning so that no part is rendered void, superfluous, contradictory or insignificant."  *Welch-Doden*, 202 Ariz. 201, ¶ 22, 42 P.3d at 1171.

¶28        Here, the UCCJEA required determining whether the factual requirements for exercising jurisdiction existed in the case before the Second Family Court.  In other words, did the facts show Mexico was Sophia's home state in substantial conformity with the UCCJEA?  *See Welch-Doden*, 202 Ariz. 201, ¶ 30, 42 P.3d at 1173 ("The drafters made it clear that the [UCCJEA] was to give priority to a finding of home state jurisdiction over any other jurisdictional

provisions."); UCCJEA, prefatory note, 9 U.L.A. 651 ("The UCCJEA prioritizes home state jurisdiction . . . ."). Whether the Second Family Court determined its own jurisdiction by employing procedures in substantial conformity with the UCCJEA was not dispositive; what mattered was the home state of the child.[2]

¶29 The trial court's interpretation of the UCCJEA could lead to troubling outcomes. Under the court's analysis, any country without jurisdictional criteria similar to the UCCJEA potentially would lack jurisdiction to make child custody determinations Arizona courts would enforce. A parent in such a country that disagreed with their court's ruling on jurisdiction could abscond with their child to Arizona hoping to thwart enforcement. We do not believe the UCCJEA was meant to be such an affront to comity or to increase the likelihood of abductions.[3] Nor does the plain language of the UCCJEA support that analysis. *See* § 25-1005(B) and (C). When a foreign country makes a child custody determination, and it has jurisdiction by virtue of being the home state of the child (under factual circumstances in substantial conformity with the UCCJEA), that custody determination must be enforced by the courts of this state.[4]

---

[2]We decline to decide what amount of time a child would have to reside in a foreign country for that country to be the home state of the child in substantial conformity with the UCCJEA. But here, as the parties stipulated and the trial court acknowledged, Sophia had resided in Mexico for a period of time that would make Mexico the home state under the UCCJEA.

[3]"Under the principle of 'comity,' courts of one jurisdiction will give effect to the laws and judicial decisions of another jurisdiction, not as a matter of obligation, but out of deference and mutual respect." *Leon v. Numkena*, 142 Ariz. 307, 311, 689 P.2d 566, 570 (App. 1984).

[4]With the exception of child custody determinations that "violate[] fundamental principles of human rights." § 25-1005(C).

**¶30**            Our holding is further buttressed by comments of the original drafters of the UCCJEA.   Under UCCJEA § 105 cmt., 9 U.L.A. 662, the drafters commented, "Custody determinations of other countries will be enforced if the facts of the case indicate that jurisdiction was in substantial compliance with the requirements of this Act."   Furthermore, the purported purposes of the UCCJEA were to:

> 1) Avoid jurisdictional competition and conflict with courts of other States in matters of child custody which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;
> 2) Promote cooperation with the courts of other States to the end that a custody decree is rendered in that State which can best decide the case in the interest of the child;
> 3) Discourage the use of the interstate system for continuing controversies over child custody;
> 4) Deter abductions of children;
> 5) Avoid relitigation of custody decisions of other States in this State;
> 6) Facilitate the enforcement of custody decrees of other States.

UCCJEA § 101 cmt., 9 U.L.A. 657.  Allowing the trial court's decision to stand would not deter the abduction of children, avoid relitigation of custody decisions, or facilitate the enforcement of custody decrees.[5]  If anything, adopting the trial court's interpretation would likely increase the risk of parents from countries without

---

[5]This case does not require us to determine whether it may be resolved solely by applying § 25-1005(B) or whether § 25-1053(A) and § 25-1005(A) must be considered.  In light of Sophia's home state status in Mexico, each analysis leads to the same result.

jurisdictional criteria similar to the UCCJEA choosing to abscond with their children to Arizona in order to relitigate custody.

¶31　　　Both Ruiz-Bours and the trial court sought guidance in *Karam v. Karam*, 6 So. 3d 87 (Fla. Dist. Ct. App. 2009). *Karam*, however, did not concern the enforcement of a child custody determination from another country. Rather, it focused on whether Florida could exercise jurisdiction when "a proceeding concerning the custody of a child ha[d] already commenced in another state having jurisdiction in substantial conformity with" the UCCJEA. *Id.* at 90.

¶32　　　In *Karam*, a husband and wife each filed a petition for dissolution; the husband in a French court in Guadeloupe and the wife in Florida. *Id.* at 88. The parties disputed whether the children's primary residence was in Guadeloupe or Florida, and the French court determined it had jurisdiction "based upon its finding that the 'usual and permanent centre of [the children's] interest' was and had always been in France . . . and that the petition was filed in the French court before one was filed by the Wife in the 'American' court." *Id.* at 89 (alteration in *Karam*). The Florida court then dismissed the child custody portion of the wife's petition, and the wife appealed. *Id.*

¶33　　　The Florida District Court of Appeal quashed the trial court's dismissal of the wife's petition based on Fla. Stat. § 61.519, titled "Simultaneous proceedings."[6] *Id.* at 90-91. Section 61.519(1) provides:

> [A] court . . . may not exercise its jurisdiction . . . if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child had been commenced in a court of another state having jurisdiction substantially in conformity with this part,

---

[6]Arizona has its own "Simultaneous proceedings" section to the UCCJEA located at A.R.S. § 25-1036(A).

unless the proceeding has been terminated or is stayed by the court of the other state . . . .

¶34　　The Florida District Court of Appeal determined "[t]he French court did not exercise its jurisdiction in substantial conformity with the UCCJEA because the UCCJEA focuses on where the children were living prior to" the commencement of proceedings. *Karam*, 6 So. 3d at 91. The French court, instead, "focused on the location of the children's 'usual and permanent centre of interest,'" which the Florida trial court "equated . . . with the UCCJEA's 'home state' jurisdictional standard." *Id.* But because "the children did not reside in Guadeloupe for six continuous months preceding the filing of the [h]usband's petition . . . the French trial court did not exercise its jurisdiction . . . in substantial conformity with the UCCJEA." *Id.* Thus, "the Florida trial court could have, and should have, exercised its jurisdiction over the child custody portion of the [w]ife's petition." *Id.*

¶35　　The trial court below erroneously relied on *Karam*, which concerned whether the Florida trial court should have exercised jurisdiction in a proceeding simultaneous to the French proceeding rather than the enforcement of a child custody determination. The crucial factor in *Karam* was not whether French law was concerned with where the children lived, but that Guadeloupe could not be considered the home state of the children given the facts of the case. *Karam*, 6 So. 3d at 91. The Florida trial court erred in "equat[ing] the French court's jurisdictional standard of 'usual and permanent centre of interest' with the UCCJEA's 'home state' jurisdictional standard," when "the record [was] clear that the children did not reside in Guadeloupe for six continuous months." *Id.* In contrast, the facts on the record before us are consistent with the UCCJEA standard. Sophia lived in Hermosillo for approximately ten months prior to Margain's initiation of the custody proceedings in Mexico, more than enough time to establish Mexico as Sophia's home state for purposes of the UCCJEA.

¶36　　Ruiz-Bours now urges the proper home state in this matter is California, and not Mexico. To the extent the argument might even be relevant, this is not so. Under the California Code,

California considers the home state to be "the state in which a child lived with a parent . . . for at least six consecutive months immediately before the commencement of a child custody proceeding. . . . A period of temporary absence of [the parent] is part of the period." Cal. Fam. Code § 3402(g). From October 2010 to August 2011, Sophia lived in Hermosillo, a period of ten consecutive months. Ruiz-Bours argues this ten-month period constitutes a temporary absence because "the stay in Hermosillo . . . was intended to be a two or three week visit with family." The California Code does not define "temporary absence." *See* Cal. Fam. Code § 3402. And while California has recognized that a parent's abduction of a child cannot form the basis for establishing jurisdiction in the abductor's state of residence, *see In re Marriage of Nurie*, 98 Cal. Rptr. 3d 200, 228-30 (Dist. Ct. App. 2009), there was no abduction when Ruiz-Bours took Sophia to Hermosillo. Nor has she cited any California cases that might lead us to conclude her ten-month absence from California was a temporary absence, especially when she did not leave Mexico until July 2012, only to abscond to Arizona. Indeed, at no point has Ruiz-Bours ever even attempted to invoke the jurisdiction of California except in her answering brief.[7]

¶37 Furthermore, according to the applicable section of the California Code, California has home state jurisdiction if it was "the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from [California] but a parent . . . continues to live in [California]." Cal. Fam. Code § 3421(a)(1). Neither Margain nor Ruiz-Bours continued to live in California when the proceedings commenced.[8]

---

[7] In Ruiz-Bours's motion contesting the jurisdiction of the Second Family Court, she stated, "I stand by the jurisdiction of the Courts of the City of Hermosillo, Sonora." And, at oral argument in this court, Ruiz-Bours conceded she has never initiated any child custody proceedings in California.

[8] Margain lived in Tijuana, Baja California, Mexico and his mother at all times held legal title to the home in Coronado, California.

And because California was not the home state of the child at the commencement of the proceedings, California could not have exercised jurisdiction to make a child custody determination under its statute unless a court having jurisdiction declined to exercise it or no court of any state had home state jurisdiction. *See* Cal. Fam. Code § 3421(a).[9] Sophia lived in Mexico for at least six consecutive months, giving Mexico home state jurisdiction, and Mexico elected to assert jurisdiction over the matter. Thus, under the California Code, a California court could not have exercised the jurisdiction Ruiz-Bours now wishes to invoke.

¶38 Ruiz-Bours also cites several cases from other states to try and persuade us that her ten-month absence was only "temporary," but we are unconvinced. Not only was her stay in Hermosillo much longer than those described in the cases she cites, but also she has not lived in California since her departure. *See Sarpel v. Eflanli*, 65 So. 3d 1080, 1081, 1083-84 (Fla. Dist. Ct. App. 2011) (affirming a lower court's treatment of children's two-month presence in Turkey to be a temporary absence and concluding Florida had jurisdiction because a parent continued to live in Florida at the commencement of proceedings); *Ogawa v. Ogawa*, 221 P.3d 699, 704-05 (Nev. 2009) (Nevada home state where three-month absence intended to be temporary vacation and did not affect six-month residency requirement and parent continued to live in Nevada when action commenced); *In re S.M.*, 938 S.W.2d 910, 918 (Mo. Ct. App. 1997) (three months spent in Kansas temporary absence because stay intended to be temporary, children received public assistance from state of Missouri as Missouri residents, and they continued to attend school in Missouri). Given these facts, we conclude the absence was not temporary and that Mexico, not California, had exclusive jurisdiction by virtue of its home state status. Accordingly, we reverse the ruling of the trial court.

---

[9]California also treats foreign countries as if they are a state of the United States in applying the UCCJEA. Cal. Fam. Code § 3405(a).

**Attorney Fees**

**¶39**      Section 25-1062 provides "[t]he court shall award the prevailing party . . . necessary and reasonable expenses incurred by or on behalf of the party, including costs . . . [and] attorney fees . . . unless the party from whom fees or expenses are sought establishes that the award is clearly inappropriate." Who is the prevailing party "is never certain until the appeal process is concluded." *Wenk v. Horizon Moving & Storage Co.*, 131 Ariz. 131, 133, 639 P.2d 321, 323 (1982). Policies that support awarding attorney fees to prevailing parties at trial must also apply to the party that ultimately prevails on appeal. *See id.* Therefore, because we reverse the ruling of the trial court, we also reverse the trial court's award of costs and attorney fees to Ruiz-Bours.

**¶40**      Margain also requests we award him "all costs and attorney's fees incurred on this appeal" pursuant to A.R.S. § 25-324 and Rules 21(a) and (c), Ariz. R. Civ. App. P. Given Margain's contemptible failure to obey the trial court's order that he not remove Sophia, we decline to award him any costs or attorney fees.

## Disposition

**¶41**      For the foregoing reasons, we reverse the ruling of the trial court and remand for proceedings consistent with this opinion.