IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ROBERTO ANTONETTI, *Petitioner*,

*v.*

THE HONORABLE TRACEY WESTERHAUSEN, Judge of the SUPERIOR
COURT OF THE STATE OF ARIZONA, in and for the County of
Maricopa, *Respondent Judge,*

ALISON MERCEDES KLINGER, *Real Party in Interest.*

No. 1 CA-SA 22-0205
FILED 1-12-2023

Petition for Special Action from the Superior Court in Maricopa County
No. FC2020-006551
The Honorable Tracey Westerhausen, Judge

**JURISDICTION ACCEPTED, RELIEF DENIED**

COUNSEL

Ellsworth Family Law PC, Mesa
By Glenn D. Halterman
*Counsel for Petitioner*

Cantor Law Group PLLC, Phoenix
By Travis Owen
*Counsel for Real Party in Interest*

---

**OPINION**

Judge Jennifer B. Campbell delivered the opinion of the Court, in which Presiding Judge Brian Y. Furuya and Judge Paul J. McMurdie joined.

---

**C A M P B E L L**, Judge:

¶1        Petitioner Roberto Antonetti (Father) seeks special action relief, challenging a superior court order exercising subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), A.R.S. §§ 25-1001 through -1067, over Alison Klinger's (Mother) petition to establish paternity, legal decision-making, parenting time, and child support for the parties' child. Because the totality of the circumstances reflects that the child permanently relocated to Arizona from his former home state, the superior court properly exercised subject matter jurisdiction over the child custody case. Accordingly, we accept special action jurisdiction but deny relief.

**BACKGROUND**

¶2        Father, an Italian citizen, moved to Tunisia in 2007. Mother, an American citizen, moved to Tunisia in 2013. In December 2013, Father and Mother began a romantic relationship. In March 2018, their son was born in Tunisia, acquiring dual Italian and American citizenship through his parents.

¶3        In February 2020, the parties traveled with the child to Italy for a vacation. While there, the Covid-19 pandemic struck the country, and by the end of the parties' planned vacation, the Italian government had imposed travel restrictions. Nonetheless, Father and Mother could have returned to Tunisia with the child at that time, but they decided to remain in Italy. Shortly thereafter, Tunisia closed its borders to international travel.

¶4        On April 13, 2020, Mother flew with the child to the United States on a repatriation flight reserved only for United States citizens. Although he could not join them, Father drove Mother and the child to the Italian airport for their flight.

¶5        Father returned to Tunisia on June 27, 2020, the first day it reopened its borders. Mother and the child remained in Arizona, where they have lived since April 13, 2020.

¶6 On November 3, 2020, Mother petitioned the superior court to establish paternity, legal decision-making, parenting time, and child support. Although Mother asked the superior court to establish paternity, neither party contests that Father is the child's biological father, and his parental status is reflected on the child's birth certificate.[1] As outlined in the petition, Mother alleged that she relocated to Arizona with the child to protect them from domestic violence perpetrated by Father. Mother requested sole legal decision-making authority for the child, sole physical custody with Father granted only supervised parenting time, and an order for child support under the Arizona Child Support Guidelines.

¶7 On January 12, 2021, a process server affixed copies of Mother's petition and a summons to appear on the front door of Father's home in Tunisia. Two months later, Father moved the superior court to dismiss the petition for lack of both subject matter and personal jurisdiction. According to Father, the child was only "temporarily absent" from Tunisia, so Tunisia remained the child's "home state" with jurisdictional priority.

¶8 In response, Mother noted that before relocating to Arizona, "[t]he child had never lived anywhere consecutively longer than three (3) months."[2] Mother also argued that Arizona is the child's home state because he "lived with her in Arizona for more than six consecutive months immediately prior to the commencement of the instant child custody proceeding."

¶9 After full briefing and an evidentiary hearing, the superior court denied Father's motion to dismiss. As outlined in its ruling, the superior court reasoned that Mother's: (1) decision to travel to the United States with the child on a repatriation flight, (2) failure to return to Tunisia when it reopened its borders to international travel, and (3) communications with Father expressing her "deep unhappiness" with their relationship and "obvious reluctance" to return to Tunisia "negate[d]" any claim of a temporary absence. The superior court also concluded that the child "had no home state" before relocating to Arizona and determined that, at this point, Arizona is the child's home state. Accordingly, the

---

[1] To the extent Mother initially challenged Father's paternity, she waived the claim by failing to pursue it.

[2] Before traveling to Arizona in April 2020, Mother and the child visited the United States on three occasions: July 20, 2018 to September 15, 2018 (58 days), April 22, 2019 to June 6, 2019 (46 days), and October 20, 2019 to December 5, 2019 (47 days).

superior court exercised jurisdiction over Mother's petition under the UCCJEA.

¶10 Father moved to amend the judgment, arguing Tunisia was the child's home state before April 2020, and even if he had reason to recognize that the child's relocation to Arizona was permanent based on his communications with Mother, six months had not transpired between those communications and the date she filed the petition, so Tunisia remained the child's home state for purposes of determining jurisdiction. The superior court denied Father's motion to amend the judgment but stated it "was wrong when it concluded that the child had no home state" before relocating to Arizona, agreeing with Father that "Tunisia was the home state for the child" before April 2020.[3] Father petitions this court for relief.

## SPECIAL ACTION JURISDICTION

¶11 "Special action jurisdiction is discretionary, but appropriate when no 'equally plain, speedy, and adequate remedy by appeal' exists." *Gutierrez v. Fox*, 242 Ariz. 259, 264, ¶ 12 (App. 2017) (quoting Ariz. R.P. Spec. Act. 1(a)). "We also have discretion to accept special action jurisdiction when statutes or procedural rules require immediate interpretation, and a petition presents a purely legal issue of first impression that is of statewide importance." *Id.* at ¶ 13 (internal quotation and citation omitted).

¶12 Here, the petition for special action raises an issue of first impression regarding the proper legal standard for evaluating whether a child is "temporarily absent" from a putative "home state" to determine initial jurisdiction under the UCCJEA. Therefore, in the exercise of our discretion, we accept special action jurisdiction.

## DISCUSSION

¶13 Father contends the superior court improperly exercised jurisdiction over this child custody matter in violation of the UCCJEA. "We review issues of law, including statutory interpretation and a court's jurisdictional authority, de novo." *Holly C. v. Tohono O'odham Nation*, 247 Ariz. 495, 505, ¶ 26 (App. 2019). "To the extent a court's jurisdictional

---

[3] As documented in exhibits attached to Mother's response to the petition for special action, a Tunisian court subsequently dismissed Father's parallel petition for custody filed in that country. Father does not contest the accuracy of these documents.

determination rests on disputed facts, however, we accept the court's findings if reasonable evidence and inferences support them." *Id.*

**¶14**　　　"[T]o prevent competing and conflicting custody orders by courts in different jurisdictions[,]" the UCCJEA vests "exclusive, continuing jurisdiction with the state that issues the initial child custody determination, subject to statutory exceptions." *Angel B. v. Vanessa J.*, 234 Ariz. 69, 72, ¶ 8 (App. 2014); *see also* A.R.S. § 25-1005(A) ("A court of this state shall treat a foreign country as if it were a state of the United States for the purpose of applying [the UCCJEA].").[4] Under the UCCJEA, an Arizona court has jurisdictional priority for an initial child custody determination if Arizona "is the home state of the child on the date of the commencement of the proceeding[.]" A.R.S. § 25-1031(A)(1). A "home state" under the UCCJEA is "[t]he state in which a child lived with a parent . . . for at least six consecutive months immediately before the commencement of a child custody proceeding, including any period during which that person is *temporarily absent* from that state." A.R.S. § 25-1002(7)(a) (emphasis added).

**¶15**　　　By the time Mother filed the petition on November 3, 2020, the child had continuously lived in Arizona for a period slightly longer than six months (since April 13, 2020). But Father argues that the child was only temporarily absent from Tunisia during this time and, therefore, Arizona lacks jurisdiction to enter an initial custody determination. *See Bata v. Konan*, 217 A.3d 774, 781 (N.J. Super. Ct. Ch. Div. 2019) ("[J]urisdiction cannot be established in a state where the time spent in that state is found to be a period of temporary absence from another state.").

**¶16**　　　The UCCJEA does not define "temporarily absent," *see* A.R.S. § 25-1002, and no Arizona case has adopted a standard for assessing whether an absence qualifies as temporary for determining a child's "home state." *See In re Marriage of Margain & Ruiz-Bours*, 239 Ariz. 369, 378, ¶¶ 36–38 (App. 2016) (rejecting a parent's contention that a child's 10-month absence from a state was temporary, noting the period in that case was "much longer" than the absences at issue in cases cited to the court); *see also Duwyenie v. Moran*, 220 Ariz. 501, 503, ¶ 9 (App. 2009) (concluding that Arizona was the child's home state notwithstanding that the child "had not lived in Arizona for six months prior to [the commencement of the custody]

---

[4]　　　Although Mother asserted that she refused to return to Tunisia, at least in part, because it offers few, if any, resources for victims of domestic violence, she never argued that the UCCJEA does not apply to this matter because the "child custody law of [Tunisia] violates fundamental principles of human rights." *See* A.R.S. § 25-1005(C).

proceedings" because the child's removal from the state was "unauthorized—and arguably criminal"). Absent any controlling authority, we consider the legal standards applied in other jurisdictions construing the UCCJEA.

¶17        Although the UCCJEA "[wa]s meant to be interpreted uniformly across jurisdictions," states have adopted three different tests to evaluate whether an absence is temporary for purposes of determining a child's home state: (1) the duration test, (2) the intent test, and (3) the totality of the circumstances test. *Matter of Marriage of Schwartz & Battini*, 410 P.3d 319, 321, 325 (Or. Ct. App. 2017); *see also* Andrea Charlow, *There's No Place Like Home: Temporary Absences in the UCCJEA Home State*, 28 J. Am. Acad. Matrim. L. 25, 30–36 (2015) (identifying the different legal tests that appellate courts have adopted to determine whether an absence is temporary under the UCCJEA).

¶18        The duration test focuses strictly on the length of the child's absence. In other words, "short absences are treated as temporary, and longer ones are not." *Marriage of Schwartz & Battini*, 410 P.3d at 325. While this approach offers the simplicity of a relatively bright-line standard, it fails to recognize that some short absences "may simply be the start of a permanent relocation." *Id.* The intent test, by contrast, requires courts to consider the parents' purpose for an absence to determine whether it should be deemed temporary. *Id.* Apart from the general difficulty of divining parties' intent, this test is also "problematic" because the parties' intentions may have differed from the outset or changed over time. *Id.*

¶19        Given the shortcomings of both the duration and the intent tests, we adopt the totality of the circumstances approach, which is the standard "most commonly used by other UCCJEA states." *Id.* at 325. Under the totality of the circumstances test, we consider "all the surrounding circumstances of a purported temporary absence, including [the] intent of the parties and [the] duration of [the] absence, to assess whether the absence should be treated as a temporary departure from a putative home state." *Id.* at 325. This test provides "greater flexibility" for a court to examine all the relevant facts, including how, when, and why "the child came to and remained in the state." *Bata*, 217 A.3d at 781, 784.

¶20        With that standard in mind, we consider the evidence presented by the parties. At the evidentiary hearing, Father testified that: (1) he did not approve of Mother leaving Italy with the child on the repatriation flight; (2) the parties agreed before Mother and the child left Italy that she and the child would return to Tunisia as soon as international

travel was reestablished; (3) Mother's communications with him after arriving in Arizona "were consistent with her returning to Tunisia"; and (4) he did not realize Mother intended to permanently remain in Arizona with the child until he was served with a copy of her petition. To support his contention that the parties intended for the child's presence in Arizona to be only temporary, Father pointed to several of Mother's communications:

> WhatsApp Message from Mother to Father on March 30, 2020, concerning a return to Tunisia:
>
> > If and when they . . . lift the restrictions about quarantine in Tunisia, we'll gladly come back and hopefully in the meantime we can find some way to communicate about our relationship and try to repair.
>
> Email from Mother to Father on April 23, 2020, concerning a banking matter:
>
> > It's pointless for me to make the transfer to my personal account if I can't wire it to my account in America so I'll just wait until I get back to Tunisia[.]
>
> WhatsApp Message from Mother to Father on July 11, 2020, explaining that she was unable to travel due to a back injury:
>
> > I know you're in a hurry for us to return but I can barely walk.

¶21        But in response to questioning, Father admitted that Mother had "expressed a desire to stay in Arizona" and conveyed considerable reluctance about returning to Tunisia. He also acknowledged that he had been copied on the following letter that Mother emailed to her Arizona therapist on August 5, 2020:

> [The child] and I did leave Italy for Phoenix on April 13th however both [Father] and I were agreed and understood that we would be in America until the Coronavirus pandemic passed and it became safe and possible to travel again.
>
> . . . .
>
> [Father] expressed sadness at our departure but agreed and understood that we needed to return to the US to have some

distance from him due to the abuse [the child] and I were suffering within our relationship.

. . . .

During our time in Phoenix, I have requested repeatedly that [Father] work constructively with me to attempt to repair our relationship or determine a go-forward plan. I have proposed various living situations, asked him to discuss my fears and issues related to our relationship and the poor living conditions in Tunisia. He has refused each time.

. . . .

Despite the four months of separation between us, I remain afraid of returning to Tunisia and [Father's] home. I have a duty to protect [the child] from the certain consequences we will suffer at [Father's] hand for protecting [the child] and myself[.]

Despite reading the letter, Father testified that he believed Mother "could still come back."

¶22 Mother, in turn, testified that she told Father she could not continue their relationship in March 2020, while in Italy, and again in April 2020, just before traveling to the United States. Stating she was afraid of Father, Mother explained that she did not directly tell him she was leaving him, with no plan to return, and instead stated that their relationship was unhealthy and harming the child. Mother also testified that after she arrived in Arizona, she repeatedly told Father that she would not "consider" returning to Tunisia unless he made behavioral changes and could assure both her and the child's safety. Although she acknowledged that she frequently tried to placate Father to avoid confrontations, Mother denied misleading him or hiding her intent to stay in Arizona with the child.

¶23 Relying on *Cook v. Arimitsu*, 907 N.W.2d 233, 239 (Minn. Ct. App. 2018), Father asserts that the six-month period for determining a child's "home state" does not begin to run until the parent in the original state "had reason to recognize the permanency of the out-of-state absence." (emphasis omitted) (citation omitted). Claiming he had *no reason* to believe the child's absence from Tunisia was permanent until he was served with Mother's petition, Father argues that the six-month period did not begin to run in this case until January 2021, two months after Mother commenced this custody proceeding.

¶24      But this contention is belied by Father's (1) admission that after arriving in the State, Mother "expressed a desire" to remain in Arizona and conveyed considerable reluctance when pressed about returning to Tunisia, and (2) emails imploring Mother to return to Tunisia, promising no "reproach await[ed]" her. *In re Marriage of Pereault*, 829 N.W.2d 192 (Iowa Ct. App. 2013) ("[I]n determining whether an absence is a 'temporary absence,' we do not believe the significance of intent can or should be restricted to the intent existing at the time of leaving. If it were so restricted, then an absence that began with [the] intent to return would remain a 'temporary absence' even long after a decision had been reached for the child to permanently relocate."). Although Father argues that "an expression of a desire to remain in Arizona is very different from a declaration [of intent] to remain in Arizona," Mother testified, unequivocally, that she told Father, both before leaving Italy and after arriving in Arizona, that she believed it was unsafe for her and the child to return to Tunisia. Considering Mother's uncontroverted testimony, Father essentially argues that the six-month period for determining the child's home state could not begin until he realized he could not persuade Mother to return to Tunisia and abandoned hope of reconciliation and reunification. But that is not the legal standard espoused under *Cook*; rather, the question is when Father had reason to recognize the child's relocation was permanent, not when he resigned himself to that reality.

¶25      Recognizing that the superior court is in the best position to determine the credibility of witnesses, resolve conflicts in the evidence, and weigh the evidence accordingly, it was not error for the court to conclude that Father had reason to believe Mother was permanently relocating to Arizona with the child when they left Italy. *See Goats v. A.J. Bayless Mkts., Inc.*, 14 Ariz. App. 166, 171 (1971) (noting the superior court "is in the best position to judge the credibility of the witnesses, the weight of evidence, and also the reasonable inferences to be drawn therefrom"). Moreover, considering the totality of the circumstances, reasonable evidence supports the superior court's finding that the child's absence from Tunisia was not temporary for purposes of the UCCJEA. As such, and given the length of the child's continuous presence in the State before Mother filed her petition, the superior court properly found that Arizona is the child's home state for purposes of subject matter jurisdiction under the UCCJEA.[5]

---

[5]      Given our disposition, we need not address Mother's contention that the superior court may now exercise jurisdiction under A.R.S. § 25-1031 based on Tunisia's dismissal of Father's petition for custody.

**CONCLUSION**

¶26        For the foregoing reasons, we accept jurisdiction but deny relief. Both parties request an award of their attorney's fees under A.R.S. § 25-324, which authorizes an award of attorney's fees after considering both parties' financial resources and the reasonableness of their positions throughout the proceedings. We have no information concerning the parties' respective financial resources. We find, however, Father's contention that he had no reason to believe the child's relocation to Arizona was permanent until he was served with Mother's custody petition patently unreasonable. Moreover, his failure to disclose the dismissal of his custody petition in the Tunisian court reflects a lack of candor. Accordingly, in our discretion, we award Mother her reasonable attorney's fees and taxable costs upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED:    AA

10